STANDARD LIFE INSURANCE CO. OF AMERICA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12475, 25842, 29779.   Promulgated July 23, 1928.

*A. J. Barron, Esq.*, and *Claris Adams, Esq.*, for the petitioner.
*Alva C. Baird, Esq.*, for the respondent.

**OPINION.**

SMITH: The net income of a life insurance company upon which the income tax is imposed is determined in an entirely different manner under the Revenue Acts of 1921 and 1924 from the way in which it was determined in prior income-tax acts. When the bill (H. R. 8245) which later became the Revenue Act of 1921, was introduced in the Senate it was accompanied by a report of the Finance Committee in which it was stated:

Sections 242–246 provide a new plan for the taxation of life insurance companies, substantially similar to the plan embodied in the Revenue Act of 1918 as first adopted by the Senate. The provisions of the present law applicable to life insurance companies are imperfect and productive of constant litigation. The proposed plan would tax life insurance companies on the basis of their investment income from interest, dividends, and rents, with suitable deductions

for expenses fairly chargeable against such investment income. The new tax would take the place of the present income and excess-profits taxes for thé year 1921, and life insurance companies would share with other insurance companies in the repeal in the year 1922 of the capital stock tax and the taxes imposed by section 503. The new tax will yield a larger revenue than the taxes which it is proposed to replace.

The present proceedings raise no question as to the correctness of the computation of the gross income of the petitioner for the years 1921 to 1924, inclusive, which is defined by statute as the gross amount of income received during the taxable year from interest, dividends, and rents. Section 244(a), Revenue Acts of 1921 and 1924. The questions in issue in these proceedings relate to deductions from gross income under subdivisions (2), (5), and (6) of section 245(a) of the Revenue Acts of 1921 and 1924. Section 245(a), so far as relevant, provides as follows:

That in the case of a life insurance company the term "net income" means the gross income less—

\*      \*      \*      \*      \*      \*      \*

(2) An amount equal to the excess, if any, over the deduction specified in paragraph (1) of this subdivision, of 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year, plus (in case of life insurance companies issuing policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation) 4 per centum of the mean of such reserve funds (not required by law) held at the beginning and end of the taxable year, as the Commissioner finds to be necessary for the protection of the holders of such policies only;

(5) Investment expenses paid during the taxable year: *Provided*, That if any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed one-fourth of 1 per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year;

(6) Taxes and other expenses paid during the taxable year exclusively upon or with respect to the real estate owned by the company, not including taxes assessed against local benefits of a kind tending to increase the value of the property assessed, and not including any amount paid out for new buildings, or for permanent improvements or betterments made to increase the value of any property. The deduction allowed by this paragraph shall be allowed in the case of taxes imposed upon a shareholder or member of a company upon his interest as shareholder or member, which are paid by the company without reimbursement from the shareholder or member, but in such cases no deduction shall be allowed the shareholder or member for the amount of such taxes.

In its return for 1921 the petitioner deducted from gross income, under subdivision (2) of section 245(a), $7,000 for investment expenses. The respondent allowed a deduction of $5,677.81 and disallowed the deduction of the balance, or $1,322.19. Counsel for petitioner and respondent admit that the only point in issue pertaining to this question is the valuation of the home office building of the company for the purpose of determining the amount to be

included in " invested assets " within the meaning of that term as used in subdivision (5) of section 245(a). There appears to be no question that the depreciated cost of the building to the petitioner at December 31, 1921, including a mortgage originally assumed of $400,000, was $537,761.97. At some time prior to 1921 petitioner had paid off $50,000 of the mortgage. The convention form of report made by the petitioner to the Insurance Department of the Commonwealth of Pennsylvania for the year 1921 shows " Book value of real estate (less $350,000 encumbrances), per Schedule A, $187,761.97." It also shows as a nonledger asset market value of the real estate in excess of the depreciated cost $260,665.03. This represents the excess of the appraised value of the home office building over the book value inclusive of the mortgage. In the determination of the invested assets of the petitioner under section 245(a)(5), Revenue Act of 1921, the respondent allowed a value for the real estate of only $187,761.91.

The evidence indicates that the appraised value of the real estate was $260,665.03 over the book value. The secretary and treasurer of the petitioner testified that the petitioner had no entry on its books in 1921 showing a value of the real estate in excess of $537,-761.97, but stated that although the petitioner had no entry upon its books it nevertheless had documents which proved that the real estate had a total value at December 31, 1921, of $798,427.

Section 245(a)(5) provides in part:

* * * The total deduction under this paragraph shall not exceed one-fourth of 1 per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year.

Since the petitioner admits that the claimed excess of the fair market value of the real estate over $537,761.97 was not shown on its books and was not reported in its return to the Commonwealth of Pennsylvania, except as a nonledger asset, we are of the opinion that there is no merit in the petitioner's contention that the excess of the appraised value of the real estate over its book value should be included in its " invested assets."

It remains to be considered whether the petitioner is entitled to include in its invested assets the book value of the real estate inclusive of an unpaid mortgage or whether the book value should be reduced by the amount of the unpaid mortgage for the purpose of arriving at the invested assets. This point is covered by the Commissioner's regulations. Article 683 of Regulations 62 provides:

* * * The invested assets are items 1–6, inclusive, item 9, and items 10 and 11 (if interest-bearing assets) of the asset page of the annual statement for life companies, and items 1–4, inclusive, item 7, and items 27–30, inclusive (if interest-bearing assets), of the asset page of the annual statement for miscellaneous stock companies. * * *

These items of the insurance statement are exclusive of encumbrances upon real estate. Item 1 of ledger assets of the convention form reads: "Book value of real estate (less—encumbrances), per Schedule A."

Disregarding, however, the regulations of the Commissioner upon this point we are of the opinion that it can not consistently be said that the book value of invested assets is inclusive of an unpaid encumbrance. The interest on the unpaid encumbrance is deductible under section 245(a)(8) of the Revenue Act of 1921. Why, therefore, should the amount of the encumbrance be included as an invested asset for the purpose of determining the investment expenses under subdivision (5)? We are of the opinion that the conclusion reached by the respondent upon this point is correct.

In its petition relating to the year 1921 petitioner states:

Under the heading "Other Real Estates Expenses", the Company claims an amount of $74,364.52, while the Internal Revenue Department allows for this item $66,364.52, a difference of $8,000.00. This sum is the item which has been assigned by us to cover office and officer supervision of real estate owned by this company. This real estate consists of a thirteen story Home Office Building, in which there are domiciled approximately sixty tenants. The supervision of this Building, with its problems of operation, repairing, renting, heating and lighting has been carried on in the general office of the life insurance company, without the specific assignment to the real estate operations for office space, record keeping charges, telephone, postage, and lighting, or for the extra calls upon the attention of the Company's officials over what would be required by an ordinary investment in real estate. We have, therefore, felt it reasonable to assign the item of $8,000.00 noted above to cover the various items enumerated.

In his answer the respondent admits that he has allowed as a deduction under the heading "Other Real Estate Expenses," only the sum of $66,364.53, a difference of $8,000. The petitioner had adduced no evidence to prove that it is entitled to the deduction of more than $66,364.53 as other real estate expenses and it makes no mention of the point in its brief. For lack of evidence the action of the respondent in disallowing the deduction of the $8,000 in question is sustained.

The second point in issue is the deductibility under subdivision (6) of section 245(a) of the Revenue Acts of 1921 and 1924 of taxes paid by the petitioner upon its capital stock. This involves the years 1921, 1922, 1923, and 1924.

The taxes paid by the petitioner to the Commonwealth of Pennsylvania and claimed as a deduction from gross income in its tax returns and disallowed by the respondent are imposed under the Acts of Assembly of June 1, 1889, P. L. 420, and June 8, 1891, P. L. 229, sec. 21, and the various supplements and amendments thereto. The last amendment to the Act of 1889, prior to the years covered by the

returns in question, is the Act of June 5, 1919, P. L. 948, sec. 1, and the last amendment to section 1 of the Act of 1891 is the Act of July 22, 1913, P. L. 903, sec. 1. These acts are quoted from West's Digest of Pennsylvania Statutes, as follows:

Sec. 20363: *Annual Reports to Auditor General.*—Hereafter, except in the case of banks, savings institutions, title insurance or trust companies, building and loan associations, and foreign insurance companies, it shall be the duty of the President, Vice President, Secretary or Treasurer of every corporation having capital stock * * * organized or incorporated by or under any laws of this Commonwealth, and of every corporation * * * organized by or under the law of any other State or Territory of the United States, or by the United States, or by any foreign government, and doing business in and liable to taxation within this Commonwealth * * * to make annually, on or before the last day of February, for the calendar year next preceding, a report in writing to the Auditor General * * *, stating specifically:

First. The amount of its capital stock at the close of the year for which report is made, together with the highest selling price per share, and the average selling price thereof during said year.

Second. Its debt account.

Third. Its income account, together with the disposition of any net income, and its profit and loss statement.

Fourth. Its general balance sheet.

Fifth. Its real estate and tangible personal property, if any, owned and permanently located outside of the Commonwealth, and value of the same; and the value of the property, if any, exempt from taxation.

Sixth. The proportion of its capital stock invested in and actually and exclusively employed and used in manufacturing within the Commonwealth during the year for which said report is made.

Seventh. A valuation and appraisal, in the manner hereinafter provided, of the capital stock of the said corporation, company, joint-stock association, or limited partnership, at its actual value in cash as it existed at the close of the year for which the report is made. (1919, July 15; P. L. 948, Sec. 1.)

Sec. 20366. *Rate of tax; payment.*—That every corporation, joint-stock association, limited partnership, and company whatsoever, from which a report is required under the twentieth section hereof, shall be subject to, and pay into the Treasury of the Commonwealth annually, a tax at the rate of five mills upon each dollar of the actual value of its whole capital stock of all kinds, including common, special, and preferred, as ascertained in the manner prescribed in said twentieth section; and it shall be the duty of the treasurer or other officers having charge of any such corporation, joint-stock association, or limited partnership, upon which a tax is imposed by this section, to transmit the amount of said tax to the treasury of the Commonwealth within thirty days from the date of the settlement of the account by the Auditor General and the State Treasurer: Provided, That for the purposes of this act, interest in limited partnerships or joint-stock associations shall be deemed to be capital stock, and taxable accordingly. (1913, July 22; P. L. 903, Sec. 1.)

The capital-stock tax imposed by the Commonwealth of Pennsylvania is a tax on property and not a tax on dividends or franchises. See *Commonwealth* v. *Standard Oil Co.*, 101 Pa. 119; *Commonwealth* v. *Union Shipbuilding Co.*, 271 Pa. 403; 114 Atl. 257; *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18. In the last-mentioned

case the United States Supreme Court, in construing the Pennsylvania Statute of May 1, 1861, P. L. 69, sec. 5, which act was merely one of the forerunners of the acts of 1889 and 1901 and their supplements, and fixed a capital-stock tax at the rate of one-half mill on every 1 per cent rate of dividends, said:

The tax now in question is not a license tax or a privilege tax; it is not a tax on business or occupation; it is not a tax on, or because of, the transportation, or the right of transit, of persons or property through the State to other States or countries. The tax is imposed equally on corporations doing business within the State, whether domestic or foreign, and whether engaged in interstate commerce or not. The tax on the capital of the corporation, on account of its property within the State, is, in substance and effect, a tax on that property. *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 209; *Western Union Telegraph Co.* v. *Attorney General of Massachusetts*, 125 U. S. 530, 552.

It has also been squarely decided in Pennsylvania that since the corporation is liable for the payment of the tax the shares of stock in the hands of its stockholders are not liable for the payment of the tax.

In *Commonwealth* v. *Fall Brook Coal Co.*, 156 Pa. 488 (1893); 26 Atl. 1071, the court passed upon an attempt to tax the defendant on shares owned by it in the Fall Brook Railway Co., which latter company had paid the capital-stock tax. The court, however, says:

\* \* \* The shares of stock in the Fall Brook Railway Company are not taxable in the hands of their holders, because they have already paid the state tax through the corporation, and are excepted in express words from the liability to taxation in the hands of the holder by the first section of the Act of 1889. \* \* \*

In *Commonwealth* v. *United Gas Improvement Co.*, 162 Pa. 602; 29 Atl. 667, the Supreme Court of Pennsylvania said:

\* \* \* When a tax has been paid by a corporation upon its entire capital stock, the same stock cannot be again charged with taxes in the hands of the separate holders of the shares into which it may be divided, under the law as it stood when this case was heard in the court below, nor under any act of assembly now in force in this state to which our attention has been called. This is further shown by *Com.* v. *Lehigh Coal and Nav. Co.*, 29 Atl. 664, the opinion in which we file herewith. \* \* \*

In *Commonwealth* v. *Lehigh Coal & Navigation Co.*, 162 Pa. 603; 29 Atl. 664, the Supreme Court of Pennsylvania said:

\* \* \* The property of the corporation consists of many items, and is often widely scattered. How shall this property be valued for the purposes of taxation? The law provides that instead of making use of an extended inventory of assets, and estimating the value of each article thereon separately, the property shall be deemed worth for purposes of taxation just what it is apparently worth for business purposes, and so adjusts its value by a statement which the corporation is required to submit annually for this purpose. Upon this statement, the auditor general fixes the actual cash value of the stock of the corporation at just what the items in the statement show its property to be worth.

The capital stock tax is then assessed upon the valuation so made, and the corporation, as such, is required to pay it to the state treasurer. These certificates of stock held by the respective stockholders represent the several interests of each holder. The capital stock comprehends the interest of all the stockholders. When the corporation, as the legal owner of the property held in its name, and as the representative and trustee of the equitable owners, pays the tax on all the stock in a single lump, this total is the exact equivalent of the aggregate of the several sums due upon the separate shares into which the stock is divided. Such payment discharges the claim of the state upon each and all of the shares into which the capital stock may have been divided, for the very obvious reason that the whole includes the parts of which it is composed.

In view of the above decisions the petitioner submits that the capital-stock tax imposed by the Commonwealth of Pennsylvania is in effect a tax imposed upon a shareholder of a company upon his interest as a shareholder which is paid by the company without reimbursement from the shareholders and is therefore deductible from gross income under section 245 (a) (6) of the statute.

Article 684 of Commissioner's Regulations 62 limits allowable deductions under section 245 (a) (6) to such items as are set forth in items 31 and 32 of the disbursements page of the annual statement of life insurance companies. Line 31 covers repairs and expenses other than taxes on real estate, and line 32 covers taxes on real estate. The petitioner reports capital-stock taxes under line 36 entitled "All Other License Fees and Taxes." Petitioner submits that the regulation is more narrow than subdivision (6) of section 245 (a) ; that the act does not, as does article 684, limit the tax for which a deduction may be allowed to a tax on real estate *per se*. Petitioner further submits that it was the intention of Congress to allow a deduction for all taxes in the nature of property taxes by whatever name they might be designated, or whether collected by the State or a subdivision thereof and that the word " taxes " in section 245 (a) (6) should be given an ordinary meaning; further that the words in subdivision (6) " exclusively upon or with respect to the real estate owned by the company " limits those words to expenses and not to taxes.

In the Revenue Act of 1921, as above indicated, Congress provided an entirely different method for computing the net income of a life insurance company from the method used in prior income-tax acts. See *National Life Insurance Co.* v. *United States*, 277 U. S. 508. Congress did not attempt to include in the gross income of the life insurance company all of its income. None of the premium income is to be included in the gross income and not all of its income from investments. For instance, gain on the sale of securities is not to be included in gross income. All that is included is interest, dividends and rents. From this gross income certain deductions are allowable. The bill, H. R. 8245, which later became the Revenue Act of 1921,

as originally passed by the House provided for a deduction from gross income under subdivision (6) of section 245(a) the following:

Taxes and other expenses paid during the taxable year exclusively upon or with respect to the real estate owned by the company, not including taxes assessed against local benefits of a kind tending to increase the value of the property assessed, and not including any amount paid out for new buildings, or for permanent improvements or betterments made to increase the value of any property. * * *

Quite clearly in this language there is no ground for the contention that the phrase " exclusively upon or with respect to the real estate owned by the company " limits those words to " expenses " and not to " taxes." Taxes and other expenses were all in the same group and we think it clear that Congress intended to limit the deduction for taxes to those paid during the taxable year " exclusively upon or with respect to the real estate owned by the company."

Subdivision (6) of section 245(a) was amended by the Senate by adding thereto an additional sentence providing:

* * * The deduction allowed by this paragraph shall be allowed in the case of taxes imposed upon a shareholder or member of a company upon his interest as shareholder or member, which are paid by the company without reimbursement from the shareholder or member, but in such cases no deduction shall be allowed the shareholder or member for the amount of such taxes.

This language is substantially the same as that contained in section 234(a)(3) of the Act and it was apparently inserted by the Senate in the Act for the purpose of bringing subdivision (6) of section 245(a) into harmony with section 234(a)(3). If the capital-stock tax imposed by the Commonwealth of Pennsylvania were imposed upon the shareholders, there would clearly be ground for the argument made by the petitioner that since the tax was paid by the petitioner it constituted a legal deduction from gross income even though under the Commissioner's regulations, article 684, Regulations 62, the amount deductible would be that portion of the total amount allowable as a deduction which the value of the real estate owned or occupied in whole or in part is of the book value of all of the real estate owned. We think it is unnecessary for us to consider, however, the bearing of the regulations upon the point in issue. As we see it, the capital-stock tax imposed by the Commonwealth of Pennsylvania is not in any sense imposed upon a shareholder or member. The tax would be collectible from the corporation in respect of its capital stock even though no shares of stock had been issued. The measure of the capital stock is not the value of the real estate but the " actual value of its whole capital stock of all kinds." We think that the phrase " exclusively upon or with respect to the real estate owned by the company," contained in subdivision (6) of section 245(a)

limits the word "taxes" and that the capital-stock tax paid by the petitioner to the Commonwealth of Pennsylvania is not a tax thus limited. The contention of the respondent upon this point is, therefore, sustained.

The third major issue is whether the petitioner may include in its "reserve funds," for the purpose of determining the deduction from gross income under section 245(a)(2) of the Revenue Acts of 1921 and 1924, its reserves or liabilities upon the coupon feature of the life insurance policies which it issues. It should be observed that the petitioner is a stock life insurance company and that it issues only nonparticipating policies; that is to say, the policyholders are not permitted to share in the profits of the company. The guaranteed premium reduction policies provide for a stipulated premium. A typical policy of the company was introduced in evidence. This policy is an ordinary life policy issued for an ordinary life premium payable throughout the life of the insured. An excess premium is charged, however, for additional policy benefits. This excess in the premium is represented by coupons attached to the policy equal in amount and payable to the policyholder on a given date annually. The policy provides that these coupons may be used by the policyholder in any one of the following ways:

(1) To reduce the succeeding year's premium;

(2) To purchase paid-up additions to the face of the policy;

(3) To reduce the number of premium payments;

(4) Be left with the company to accumulate at interest at 3½ per cent.

The policy also provides that if the coupons are permitted to remain with the company and accumulate at interest they may be withdrawn at any time or in the event of death will be added to the principal sum payable under the policy. If the coupons are allowed to accumulate in accordance with either option (3) or (4), the policy becomes paid up at the end of 25 years and no further premium payments are required.

In making its insurance statements to the Commonwealth of Pennsylvania for the years 1921 to 1924, inclusive, the petitioner reported its reserve in respect of the unsurrendered coupons, together with interest accumulated thereon, on line 22 of the liability statement of the convention form, which carries the title "Dividends left with the company to accumulate with interest, and accrued interest thereon." The liability for the face of the coupons and the accrued interest thereon were shown separately.

The annual statement made by life insurance companies to the insurance departments of the several States are made upon standard forms which have been adopted by practically all of the States of

the United States. This form was adopted by the National Convention of Insurance Commissioners, a voluntary organization composed of the insurance commissioners of all of the States in the Union, who have associated themselves together for the purpose of maintaining uniformity of action. The insurance commissioners, noting the lack of uniformity of stock life insurance companies in making their returns with respect to their reserve liabilities on guaranteed premium reduction policies, passed the following resolution at their convention held in 1927:

There has been some lack of uniformity among some companies which write so-called " coupon policies " in the manner of reporting matured coupons which are not cashed by the policyholder as they become due but are permitted to accumulate and remain with the company to apply to the reduction of the premium paying period, the purchase of additional insurance, or some similar guaranteed policy benefit. The proceeds of such matured coupons are, clearly, held by such companies to meet guaranteed policy obligations at maturity. They are therefore reserves required by law and should be included in the reserves of the company reported above Line Seven on the Convention blank.

Line Seven of the convention blank is entitled " Net Reserve (paid for basis)."

What constitutes the reserve funds of insurance companies has been before the courts in numerous cases. In *McCoach* v. *Insurance Co. of North America*, 244 U. S. 585, the court had under consideration the question whether there might be included in " reserve funds " under the provisions of section 38 of the Excise Tax Act of August 5, 1909, which provided for the deduction from gross income of " the net addition, if any, required by law to be made within the year to reserve funds " certain unpaid losses on fire insurance policies. The court held:

The Act of Congress, on the other hand, deals with reserves not particularly in their bearing upon the solvency of the company, but as they aid in determining what part of the gross income ought to be treated as net income for purposes of taxation. There is a specific provision for deducting "all losses actually sustained within the year and not compensated by insurance or otherwise". And this is a sufficient indication that losses in immediate contemplation, but not as yet actually sustained, were not intended to be treated as part of the reserve funds; that term rather having reference to the funds ordinarily held as against the contingent liability on outstanding policies.

In *United States* v. *Boston Insurance Co.*, 269 U. S. 197, it was said:

It follows from *McCoach* v. *Insurance Co.* that the permitted deductions specified by § 12, Act 1916, do not necessarily include anything which may be denominated " reserve fund " by state statute or officer. We there distinctly ruled that the " reserve fund" of the Federal Act did not include something held by a fire and marine insurance company to cover accrued, but unsettled claims for losses. We adhere to and reaffirm that doctrine. * * *

In *New York Life Insurance Co.* v. *Edwards*, 271 U. S. 109, the court stated that in the two above-mentioned decisions it was—

pointed out that "the net addition, if any, required by law to be made within the year to reserve funds", does not necessarily include whatever a state official may so designate; that "reserve funds" has a technical meaning. It is unnecessary now to amplify what was there said. The item under consideration represented a liability and not something reserved from premiums to meet policy obligations at maturity.

Among other issues before the court in the last-mentioned case was the question whether the New York Life Insurance Co. was entitled to include in its reserve funds the estimated value on December 31, 1913, of future premiums waived in policies issued amounting to $16,629 by reason of a clause in the contract by which the company agreed to waive payments of premiums after proof of total and permanent disability. The company claimed that this amount should be added to the reserve fund and deducted from gross income as a net addition to reserve funds. The court held with respect to this issue:

The Superintendent of Insurance of New York required this item to be reported as a liability and did not treat it as part of the general reserve. Upon the agreed facts we cannot say that it was part of any reserve required by the laws of New York. There is nothing to show how "the value of the contractual benefits" under these policies was arrived at and, considering the evidence presented, we must accept the Superintendent's conclusion. The Company has not shown enough to establish its right to the exemption.

The Revenue Acts of 1921 and 1924, unlike prior revenue acts, do not permit a life insurance company to deduct from gross income in determining net income "the net addition, if any, required by law to be made to reserve funds." It provides, however, that in computing net income there may be deducted from the income from investments, among other items, an amount equal to the excess, if any, over the deduction specified in section 245(a)(1) of 4 per cent of the mean of the reserve funds required by law and held at the beginning and end of the taxable year. Counsel for the petitioner suggests that the term "reserve funds" in the Revenue Acts of 1921 and 1924 may have a different connotation from the term "reserve funds" used in prior revenue acts. It calls attention to the fact that under section 245 (a)(8) a life insurance company is permitted to deduct from gross income interest paid upon indebtedness, and that if the amount reserved by the petitioner to meet its obligations in respect to the premium reduction coupons is not a part of its "reserve funds," the petitioner is entitled to deduct interest paid upon such accumulations under subdivision (8). We are of the opinion, however, that the term "reserve funds" has the same meaning under all acts. The question for our determination is whether the amount set aside by the petitioner to meet its obligations in respect of unsurrendered premium

reduction coupons is a part of the "reserve funds" which it is required by law to maintain.

The argument of the petitioner is that the real reserve of a life insurance company is that portion of its premiums which the law of the State in which it transacts business requires the company to set aside and hold for the purpose of meeting policy obligations at maturity. At the hearing of this proceeding a life insurance reserve was defined by Henry W. Buttolph, an expert of 30 years' experience, who has served a number of leading companies and a number of insurance companies as consultant, who has long been a member of the Actuaries' Society of America, and, at the present time, is a member of the Board of Governors of the American Institute of Actuaries, as follows:

The reserve under a life insurance policy at any time is that sum of money which, together with the present value of future net premiums which the policyholder is obligated to pay, will cover the guarantees made in the policy by the company, assuming a fixed rate of interest to be earned on the company's investment on the reserve, and that deaths will occur in accordance with a certain table of mortality.

It is contended with respect to the policies issued by the petitioner that it is impossible to tell at the close of any year what use the insured will make of a premium reduction coupon not surrendered at the close of the year. He may use it for the purchase of paid-up additions to the face of the policy or he may choose to pay the full premium demanded by the policy for 25 years and then cease to pay further premiums. In the latter event the policy automatically becomes a paid-up policy. The policyholder is not required to notify the company of any election. In the case of a policy issued on the life of an individual 37 years of age the ordinary life reserve on the standard of valuation adopted by the petitioner at the end of the twenty-fifth year is $425.48. The reserve on a 25-payment life policy issued on an individual of the same age at the end of the twenty-fifth year is $651.55. Under the practice of the petitioner during the taxable years the $425.48 representing the ordinary life reserve on the policy indicated is shown on line 7 of the report to the State Insurance Department after the title "Net Reserve (paid for basis),"  while the balance of the reserve (if it may be properly considered as such) is shown on line 22, "Dividends left with the company to accumulate at interest, and accrued interest thereon." It is insisted, however, that the amount shown on line 22 is in truth and in fact a part of the policy reserve and that it constitutes a part of its reserve funds; further, that the amount might more properly have been reported on line 7. It is further contended that if a coupon policy, which includes an option rendering it paid-up at the end of the twenty-fifth year, is not reserved against year by year as a 25-pay

life policy, there will not be a sufficient reserve accumulation at the end of the twenty-fifth year to carry out the definite guaranteed obligations of the policy.

It is further insisted that the policyholder has the option of applying unsurrendered coupons to the purchase of additional paid-up insurance. If he elects to take this option the policy at the end of the fifteenth year, for example, may be payable in the event of death in the sum of $11,500 instead of $10,000, the original face value of the policy. It is submitted that it is obvious that the ordinary life reserve maintained upon a $10,000 policy is not sufficient to carry to maturity a $11,500 policy. It is further submitted that, where a variety of options is granted the policyholder, the contingency which would be the most costly to the company is the obligation which should determine the proper reserve.

The petitioner was required during the taxable years involved herein to compute its reserves under the provisions of the statutes of Pennsylvania. The particular section governing the computation of the reserve liability on life insurance policies is section 301 of the Act of 1921, P. L. 789, found in West's Digest of Pennsylvania Statutes, Cum. Supp., § 12490a–301, and, so far as pertinent, provides as follows:

*Computation of reserve liability*—The Insurance Commissioner shall each year compute the reserve liability, as of the thirty-first day of December of the preceding year, of every company authorized to make insurance on lives in this Commonwealth, in accordance with the terms of the policy, contract, and rules following:

(a) The net value of all outstanding policies of life insurance, issued by the company prior to the first day of January, one thousand eight hundred and ninety, shall be computed upon the basis of the American experience table of mortality, with interest at not less than four and one-half and not more than six per centum per annum.

(b) The net value of all outstanding policies, issued between the first day of January, one thousand eight hundred and ninety, and the first day of January, one thousand nine hundred and three, on the combined experience of actuaries' table of mortality, with interest at four per centum per annum.

(c) The net value of all outstanding policies of life insurance, issued on and after the first day of January, nineteen hundred and three, on the American experience table of mortality, with interest at three and one-half per centum per annum.

(d) The net value of all policies of life insurance, issued on and after January first, one thousand nine hundred and twenty-one, where the premiums are payable monthly or oftener, shall be valued according to the American experience table of mortality, with interest at three and one-half per centum per annum. But any company may voluntarily value its industrial policies according to the standard industrial mortality table, with interest at three and one-half per centum per annum.

The net value of a policy at any time shall be taken to be the single net premium which will, at that time, effect the insurance, less the value at that

time of the future net premiums called for by the table of mortality and rate of interest designated.

   \*        \*        \*        \*        \*        \*        \*

Any such company may, however, at any time elect to reserve on the American experience table of mortality, with a lower rate of interest, but at a rate not less than three per centum, and its policy obligation shall thereafter be valued accordingly.

The aggregate net value so ascertained of the policies of any such life insurance company shall be deemed its reserve liability, to provide for which it shall hold funds in secure investments of an amount equal to such net value above all its other liabilities. The Insurance Commissioner shall, after having determined as above the net value of all the policies in force, see that the company has that amount in safe legal securities, after all its other debts and claims against it have been provided for. The provisions of this section for the valuation of policies and for premium rates shall not apply to companies or associations transacting business on the mutual assessment plan.

It is under this statute that all policies were valued by the Commonwealth of Pennsylvania and all reserves were required during the years 1921 to 1924.

Under the above statute, the reserve or net value of the policy on any given date is deemed to be the difference between the single net premium which will at that time effect the insurance, and the present value of future net premiums payable under the policy. The single net premium is the amount of money necessary to be in hand, if no further premiums are to be paid by the policyholder, to cover benefits to which the company has obligated itself in its policy contract.

The method of determining the reserve fund of the petitioner corporation was explained by one witness at the hearing who was the Actuary for the Insurance Department of the Commonwealth of Pennsylvania. His testimony is as follows:

Q. Will you state just what your experience has been with reference to requiring companies that are incorporated under the laws of Pennsylvania, to maintain reserves to meet the obligations contained in policies that were known, in the earlier days, either as a guaranteed premium dividend policy, or now known as guaranteed reduction coupon policies?

A. In the early days I valued all of those, but we had no form of that kind in the Pennsylvania companies, prior to 1905 or 1906. Prior to that time, we had reciprocal laws with Massachusetts, by which they would not accept our valuations and we would not accept theirs; and I had a company, the Columbian National, of Boston, which issued coupon policies, and those coupon policies were sent to me to be valued. I found out that the contract called for—of the twenty payment life contract called for—if the coupons were left with the company to accumulate, they guaranteed it to become a sixteen payment policy instead of twenty payment policy. I started valuing it as a sixteen payment policy, and it got more and more confusing, because a lot of them took the coupons in cash, and they threw the whole thing out. So that I had to come back to the principle of valuing those contracts as twenty payment life con-

tracts, and having the company send me the accumulations, or coupons with interest, and those amounts were guaranteed by the Massachusetts Insurance Department as being correct, they having gone over them, and I included them in reserves above line seven. * * * When our companies here commenced to issuing coupon policies, I adopted that same way; I would value the contract as it was written, and the coupons were put in charge of the examiners of the Department, to ascertain whether the values were correct with regard to them, and those two items together made the entire reserve valuation as charged against the company.

The essence of the question before us is whether the obligation of the petitioner with respect to the unsurrendered coupons shown upon its annual statements for the years in question on line 22 of the convention form of report is a part of its " reserve funds " or simply a mere liability of the company. A mere accrued liability does not constitute a part of the reserve funds of an insurance company. The Supreme Court has pointed out in *McCoach* v. *Insurance Company of North America, supra,* that the term " reserve funds " as applied to a fire insurance company has " reference to the funds ordinarily held as against the contingent liability on outstanding policies." This definition is not, however, applicable to the reserve funds of a life insurance company. A life insurance company has an absolute liability in respect of every policy so long as premiums are paid thereon. The liability is not contingent. The only uncertainty in the case of the life insurance company is the date upon which the company will have to pay a loss under a policy. The Supreme Court has pointed out that the term " reserve funds " as applied to life insurance companies has reference to " something reserved from premiums to meet policy obligations at maturity." The amounts claimed by the petitioner to represent reserve funds, including the obligation of the petitioner in respect of unsurrendered coupons, meets the test of this definition. It is true that the policyholder may demand the payment of the face of a matured coupon at any time together with interest thereon. If he does that the company is simply paying off a policy obligation and the policyholder has surrendered a part of his policy. Most life insurance companies write policies which have a surrender value. The policyholder may at any time after the lapse of three or more years surrender his policy and obtain from the insurance company the surrender value. We apprehend, however, that such a feature of the policy providing for the payment of a surrender value does not in any wise change the fact that the liability of the insurance company in respect of the policy is a " reserve " and that the amount thereof constitutes a part of its reserve funds. From the standpoint of insurance accounting there can be no sharp line of demarcation between the reserve liability of an insurance company

and other policy liabilities. One of the policy obligations of the petitioner is to pay to the policyholder or the beneficiary of the policy a certain amount together with interest at some date in the future, provided the premium called for by the policy is paid in full. The question might arise as to whether in the event that the policyholder pays the full amount of the premium he is simply paying as a *premium* the amount called for by the policy less the amounts shown in the premium reduction coupon. It might be contended that in such case the excess payment by the policyholder or rather the difference between the stipulated premium and the premium reduction coupon represents merely a deposit by the policyholder of money with the insurance company which the policyholder or his beneficiary is entitled to demand back at any time. We think, however, that the theory that the amount of the premium covered by the premium reduction coupon is simply a deposit of money with the insurance company is not the correct theory in the case. The policyholder has numerous options with respect to the amount represented by the premium reduction coupon. The insurance company is bound to hold an amount in reserve to meet all its obligations upon the policy. We think that in truth and in fact there can be no valid distinction between the amount reserved by the insurance company to meet its liability in respect of the particular premium represented by the premium reduction coupon and the balance of the premium. It is the unqualified testimony of the Actuary of the Pennsylvania Insurance Department that the amounts held by the petitioner to meet its liability in respect of the unsurrendered coupons, together with interest thereon, is a part of the reserve funds of the insurance company required by the laws of the Commonwealth of Pennsylvania. The amount thus reserved is, in our opinion, a part of the " reserve funds " of the life insurance company within the meaning of section 245 (a) (2) of the Revenue Acts of 1921 and 1924.

It should be noted that in this proceeding we are not dealing with dividends declared by a mutual company upon participating policies. The liability of the petitioner with respect to the premium reduction coupons is an absolute liability. It is not contingent upon whether there is any redundancy in the premium. Any redundancy in the premium charge upon policies issued by the petitioner goes to the stockholders and not to the policyholders. The petitioner's absolute liability in respect of unsurrendered premium coupons is the same as its liability to pay any portion of the principal of the policy upon the death of the insured.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*