WESTERN NATIONAL LIFE INSURANCE COMPANY OF TEXAS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1621–64. Filed May 13, 1968.

*J. W. Bullion* and *Buford P. Berry*, for the petitioner.
*Harold L. Cook*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in income tax against petitioner as follows:

| Year | Deficiency |
| --- | --- |
| 1958 | $49, 960. 98 |
| 1959 | 47, 856. 21 |
| 1960 | 7, 256. 03 |
| 1961 | 22, 216. 23 |

Respondent has conceded an issue relating to interest on policy and contract funds. Petitioner has conceded that it is not entitled to deduct from gross investment income in determining investment yield during the years in question, 80 percent of the interest paid on the mortgage,

and that the respondent did not err in determining earnings rates pursuant to the provisions of section 805(b), I.R.C. 1954, by increasing investment yield by 80 percent of the interest paid by petitioner on the indebtedness to which its real estate was subject during the years 1956–61.

The remaining issues, all to be determined under section 805(b)(4), are (1) whether petitioner in establishing the "fair market value" of its home office property as an asset may exclude the mortgage encumbrances on the improved real estate which was acquired "subject to the mortgage"; whether petitioner, in determining the mean of its assets under section 805(b)(4), must include (2) "net premiums deferred and uncollected"; (3) "premiums due and unpaid"; (4) "loading" applicable to gross premiums deferred and uncollected; (5) agents' debit balances; and (6) accounts receivable from reinsurance assumed.

### FINDINGS OF FACT

Substantially all of the facts have been stipulated. Those facts which have been stipulated are hereby found and are recited in pertinent parts. From the testimony of the only witness and the exhibits received in evidence we make such findings of fact as might hereinafter appear which are not stipulated facts.

Petitioner is a life insurance company duly organized under the insurance laws of the State of Texas and, at all times material, was engaged in business as a life insurance company as defined in section 801(a), I.R.C. 1954. Petitioner's principal place of business is now and was at the date of filing of its petition in its home office building at 205 East 10th Street, Amarillo, Tex. It is the wholly owned subsidiary of the Southwestern Investment Co.

As a life insurance company petitioner writes life and other types of insurance permitted to be written by life companies and carries on an investment business. It conducts two broad categories of business, i.e., underwriting and investments.

Petitioner keeps a cash receipts and disbursements ledger, as required by the insurance laws, and an accrual ledger. It has prepared all of its Federal income tax returns and all of its National Association of Insurance Commissioners (NAIC) convention forms [1] on the basis of an accrual method of accounting and a year ending December 31 of each year.

Petitioner filed its Federal income tax returns for the taxable years ending December 31, 1958, to December 31, 1961, inclusive, with the district director of internal revenue at Dallas, Tex. Each year petitioner was required to and did file a duplicate of its NAIC annual

---

[1] Annual statements required to be filed with the Board of Insurance Commissioners of the State of Texas, for use there and in other States in which it does business.

statement for that year with its Federal income tax return. This statement is prepared on a hybrid system on which petitioner must report its cash receipts and disbursements which are then converted to an accrual basis, and is for use for examination and audit by State insurance departments and has nothing to do directly with income tax.

Petitioner owns its home office building subject to a mortgage indebtedness. It acquired such real estate by deed on January 6, 1956, subject to an outstanding mortgage indebtedness of $700,000. The principal amount outstanding of the mortgage indebtedness to which the property was subject at the end of the respective years was as follows:

| Year | Principal mortgage indebtedness, Dec. 31 |
|---|---|
| 1956 | $661,000 |
| 1957 | 625,000 |
| 1958 | 589,000 |
| 1959 | 553,000 |
| 1960 | 517,000 |
| 1961 | 481,000 |

At all times material the fair market value of petitioner's home office real estate, free and clear of any mortgage indebtedness, was $912,500.

Petitioner leases the entire building to the Southwestern Investment Co., its parent company, which operates the building, paying for all repairs, utilities, and janitorial services. Southwestern Investment Co. subleases 20 percent of it to petitioner. At all times material 80 percent of the entire rental value of petitioner's home office real estate was held and used by petitioner as an investment and the remaining 20 percent was used by petitioner in its insurance business.

There is a practice in the life insurance industry that life companies generally attempt to avoid liability for any indebtedness on their real estate. They acquire their real estate subject to indebtedness. They do not borrow money to invest; they invest their assets. Pursuant to this practice petitioner bought its home office property subject to the mortgage and was not liable on the note secured by the mortgage.

Standard Improvement Co. is liable for the note secured by the mortgage. It is a dormant corporation created and used for this purpose. It was set up with small capital, borrowing the money to build the building, and then conveying the property to petitioner subject to the indebtedness. The life insurance company which made the mortgage loan was aware of the character of Standard Improvement Co. and required a lease on the entire building by Southwestern Investment Co. to make its loan safe. Petitioner was required to and did make all payments of principal and interest on the indebtedness when due. By making the principal payments on the mortgage petitioner's equity in the building was increased.

Petitioner, on its income tax returns for the years in issue, valued its real estate (home office) for purposes of section 805(b)(4) as of the end of the respective years, as follows (cost less the outstanding encumbrance and depreciation allowances):

| Year | Amount |
|---|---|
| 1958 | $243,606.07 |
| 1959 | 260,147.11 |
| 1960 | 276,688.15 |
| 1961 | 293,229.19 |

In its NAIC annual statements petitioner shows its real estate as an asset. It is required in these statements to reduce the book value of its real estate (determined in the accepted sense) by the principal balance of the mortgage indebtedness to which it is subject because petitioner does not owe the debt.

Petitioner regards the fair market value of its home office real estate, less the encumbrance, as the value of that property for its investment purposes because, in order to pay off the mortgage indebtedness in full, petitioner would be required to pay off this indebtedness with funds obtained from liquidating other investment assets.

In life insurance, premiums are the agreed price for assuming and carrying the risk. The part of the premium intended to meet the cost of insurance, both current and future, and carry it from period to period, is called the net premium. In addition to this amount, policyholders also pay what is known as loading, which is a sum added to the net premium for estimated administration, management and operating expenses, as well as for contingencies, and, in some cases, profits. Loading when added to the net premium constitutes what is known as the gross premium. "Premiums deferred and uncollected" are premiums not yet due to be paid under the terms of the policies, and will not become due prior to the end of the year. No premium collected but not recorded would be shown in the deferred and uncollected accounts. "Premiums due and unpaid" are premiums which relate only to accident and health insurance and are due to be paid before the end of the year under the terms of the policies but which have not been paid. There is no obligation, legal or otherwise, on insured to pay to the insurer either premiums deferred and uncollected or premiums due and unpaid. If the policyholder does not pay the premium in conformity with the provisions of the policy, the policy is canceled after the grace period and appropriate adjustments are made to reserves.

The net premiums deferred and uncollected, the premiums due and unpaid, the loading, and the total thereof with reference to petitioner's outstanding policies as of the end of the various years indicated were:

| Year ended Dec. 31— | Net deferred and uncollected | Due and unpaid | Loading | Total |
|---|---|---|---|---|
| 1953 | $25,863.53 | | $19,386.25 | $45,249.78 |
| 1954 | 53,974.24 | $1,120.46 | 51,837.30 | 106,932.00 |
| 1955 | 99,450.92 | 1,956.52 | 51,112.80 | 152,520.24 |
| 1956 | 118,775.16 | 2,801.23 | 53,566.34 | 175,142.73 |
| 1957 | 156,892.16 | 3,283.23 | 71,722.36 | 231,897.75 |
| 1958 | 228,046.33 | 4,302.14 | 65,990.07 | 298,338.54 |
| 1959 | 273,720.53 | 3,809.40 | 60,885.65 | 338,415.58 |
| 1960 | 344,414.83 | 5,261.42 | 69,854.42 | 419,530.67 |
| 1961 | 415,805.17 | 5,331.09 | 69,847.09 | 490,983.35 |

The yearend reserve on each life insurance policy is computed on the assumption that the entire premium for the current policy year has been collected a year in advance. As an offset the portion of the current policy year net premium which has not been collected is set up as an asset. The reserve liability is overstated and such net premiums are set up as an asset to offset the excessive reserve and to avoid distortion.

Assuming a policy anniversary date of December 1, petitioner's accounting would be as set forth below with respect to a $1,000 whole-life policy issued at age 35 with a gross annual premium on a quarterly basis of $22.48 and a first year net premium of $4.73, a first year mortality reserve of $2 and a first year loading of 78.95 percent or $17.75:

### FIRST YEAR

#### 12/1 First Quarterly Premium $5.62

*Cash ledger*
Debit cash $5.62        Credit premium income $5.62
*Accrual ledger*
Debit expense—Increase in reserve $2. Credit mortality reserve $2
Debit deferred and uncollected premium $3.55, credit income—adjustment of deferred and uncollected premium $3.55
(Memo (gross deferred and uncollected) 16.85—loading 13.31—net 3.55)

#### 3/1 Second Quarterly Premium $5.62

*Cash ledger*
Debit cash $5.62        Credit premium income $5.62
*Accrual ledger*
Debit income—adjustment of deferred and uncollected premium $1.18
Credit deferred and uncollected premium $1.18
(Memo (gross deferred and uncollected) 11.24—loading 8.87 net 2.37)

#### 6/1 Third Quarterly Premium $5.62

*Cash ledger*
Debit cash $5.62        Credit premium income $5.62
*Accrual ledger*
Debit income—adjustment of deferred and uncollected premium $1.18. Credit deferred and uncollected premium $1.18
(Memo (gross deferred and uncollected) 5.62—Loading 4.44 net 1.19)

#### 9/1 Fourth Quarterly Premium [$5.62]

*Cash ledger*
Debit cash $5.62        Credit premium income $5.62
*Accrual ledger*
Debit income—adjustment of deferred and uncollected premium $1.19
Credit deferred and uncollected premium $1.19

## CASH LEDGER

| Cash (asset account) | Dr. | Cr. | Bal. | Premium income (income account) | Dr. | Cr. | Bal. |
|---|---|---|---|---|---|---|---|
| 12/1 | $5.62 | ------- | $5.62 | 12/1 | ------- | $5.62 | $5.62 |
| 3/1 | 5.62 | ------- | 11.24 | 3/1 | ------- | 5.62 | 11.24 |
| 6/1 | 5.62 | ------- | 16.86 | 6/1 | ------- | 5.62 | 16.86 |
| 9/1 | 5.62 | ------- | 22.48 | 9/1 | ------- | 5.62 | 22.48 |

## ACCRUAL LEDGER

| Adjustment of reserves (expense account) | Dr. | Cr. | Bal. | Mortality reserve (liability) | Dr. | Cr. | Bal. |
|---|---|---|---|---|---|---|---|
| 12/1 | $2.00 | ------- | $2.00 | | ------- | $2.00 | $2.00 |

| Deferred and uncollected premium (asset) | Dr. | Cr. | Bal. | Adjustment of deferred and uncollected premium (income) [1] | Dr. | Cr. | Bal. |
|---|---|---|---|---|---|---|---|
| 12/1 | 3.55 | ------- | 3.55 | 12/1 | ------- | 3.55 | 3.55 |
| 3/1 | | 1.18 | 2.37 | 3/1 | 1.18 | ------- | 2.37 |
| 6/1 | | 1.18 | 1.19 | 6/1 | 1.18 | ------- | 1.19 |
| 9/1 | | 1.19 | 0 | 9/1 | 1.19 | ------- | 0 |

[1] Amount reflected in this account is the gross deferred and uncollected premium less the loading included therein. However, for Federal income tax purposes and annual statement purposes where premium income is reported or shown it is the gross deferred and uncollected premium that is reported or shown. Further, for annual statement purposes loading is reflected as an expense in the summary of operations on p. 4 [annual statement]; however, for Federal income tax purposes loading is not claimed as an expense.

### SECOND YEAR

#### 12/1 First Quarterly Premium $5.62

*Cash ledger*
Debit cash $5.62   Credit premium income $5.62
*Accrual ledger*
Debit expense—Increase in reserve $16. Credit mortality reserve $16
Debit deferred and uncollected premium $15.82, credit income—adjustment of deferred and uncollected premium $15.82
(Memo (gross deferred and uncollected) 16.86—loading 6.18% 1.04 net 15.82)

#### 3/1 Second Quarterly Premium $5.62

*Cash ledger*
Debit cash $5.62   Credit premium income $5.62
*Accrual ledger*
Debit income—adjustment of deferred and uncollected premium $5.27. Credit deferred and uncollected premium $5.27.
(Memo (gross deferred and uncollected) 11.24—loading 6.18% .69¢ net 10.55)

#### 6/1 Third Quarterly Premium $5.62

*Cash ledger*
Debit cash $5.62   Credit premium income $5.62
*Accrual ledger*
Debit income—adjustment of deferred and uncollected premium $5.27. Credit deferred and uncollected premium $5.27.
(Memo (gross deferred and uncollected) 5.62—loading 6.18% .35¢ net 5.27)

#### 9/1 Fourth Quarterly Premium $5.62

*Cash ledger*
Debit cash $5.62   Credit premium income $5.62
*Accrual ledger*
Debit income—adjustment of deferred and uncollected premium $5.28. Credit deferred and uncollected premium $5.28

## CASH LEDGER

| Cash (asset account) | | | | Premium income (income account) | | | |
|---|---|---|---|---|---|---|---|
| | Dr. | Cr. | Bal. | | Dr. | Cr. | Bal. |
| 12/1 | $5.62 | -------- | $5.62 | 12/1 | $5.62 | 5.62 | $5.62 |
| 3/1 | 5.62 | -------- | 11.24 | 3/1 | 5.62 | | 11.24 |
| 6/1 | 5.62 | -------- | 16.86 | 6/1 | 5.62 | | 16.86 |
| 9/1 | 5.62 | -------- | 22.48 | 9/1 | 5.62 | | 22.48 |

## ACCRUAL LEDGER

| Adjustment of reserves (expense account) | | | | Mortality reserve (liability) | | | |
|---|---|---|---|---|---|---|---|
| | Dr. | Cr. | Bal. | | Dr. | Cr. | Bal. |
| 12/1 | $16.00 | -------- | $16.00 | 12/1 | | $16.00 | $16.00 |

| Deferred and uncollected premium (asset) | | | | Adjustment of deferred and uncollected premium (income) [1] | | | |
|---|---|---|---|---|---|---|---|
| | Dr. | Cr. | Bal. | | Dr. | Cr. | Bal. |
| 12/1 | 15.82 | -------- | 15.82 | 12/1 | | 15.82 | 15.82 |
| 3/1 | | 5.27 | 10.55 | 3/1 | 5.27 | -------- | 10.55 |
| 6/1 | | 5.27 | 5.28 | 6/1 | 5.27 | -------- | 5.28 |
| 9/1 | | 5.28 | 0 | 9/1 | 5.28 | -------- | 0 |

[1] Amount reflected in this account is the gross deferred and uncollected premium less the loading included therein. However, for Federal income tax purposes and annual statement purposes where premium income is reported or shown it is the gross deferred and uncollected premium that is reported or shown. Further, for annual statement purposes loading is reflected as an expense in the summary of operations on p. 4 [annual statement]; however, for Federal income tax purposes loading is not claimed as an expense.

The NAIC annual statement treats deferred and uncollected premiums on a net basis. Item 17, on the assets page of the balance sheet, calls for the statement of "Life insurance premiums and annuity considerations deferred and uncollected" on a net premium basis. Exhibit 13, which gives the detail of the assets, sets forth deferred and uncollected premiums on a net basis. It provides for a memorandum account to show the amount of loading excluded from the deferred and uncollected premiums. Item 16 of the liabilities page of the balance sheet calls for a statement of the " 'Cost of collection' on premiums and annuity considerations deferred and uncollected in excess of total loading thereon." As required by the NAIC annual statement, petitioner's annual statements showed net premiums deferred and uncollected as an asset. Also in conformity with the form, petitioner's annual statement did not show loading as an asset.

Exhibit 13 of the NAIC annual statement provides for the disclosure of three kinds of assets—ledger assets, nonledger assets, and nonadmitted assets. Ledger assets are cash or assets that have been acquired with cash to the extent of that cash investment. Nonledger assets have not resulted in the receipt of money. Petitioner, for example, in its NAIC annual statement for 1961, showed as nonledger assets the excess of the value of its stock portfolio over cost, net pre-

miums deferred and uncollected, premiums due and unpaid, and interest due and accrued. Nonadmitted assets are assets that life insurance companies are not permitted to carry as ledger or nonledger assets, e.g., furniture, paper profits on stocks, and agents' debit balances.

In the summary of operations contained in the NAIC annual statements, line 1.1, "Premiums and annuity considerations," includes deferred and uncollected premiums on a gross basis. It (line 1.1) provides for the inclusion of deferred and uncollected premiums at gross to be added to gross premiums collected during the year less deferred and uncollected premiums at gross as of the end of the previous year. Line 17, which is the "Increase in aggregate reserve for policies and contracts with life contingencies," removes from income the net portion of the deferred and uncollected premiums. Line 25 provides for the deduction of the increase in loading on deferred and uncollected premiums and also for the deduction of cost of collection of premiums in excess of loading on deferred and uncollected premiums.

Net premiums deferred and uncollected, the loading thereon and premiums due and unpaid cannot be collected as a matter of right, they cannot be invested, and they are productive of no income. They are bookkeeping items to offset the distortion of an overstatement of reserves.

Petitioner pays no investment expenses out of loading. Loading relates only to the writing of insurance and the conduct of the business of underwriting insurance. It is expected to cover agents' commissions and insurance operating expenses and to provide, if possible, an underwriting profit. Petitioner can make no use in its investment business of either premiums deferred and uncollected or due and unpaid. When an insured does not pay a premium when due, petitioner through its agents and a home office policy service section makes a strenuous effort to cause the insured to maintain his policy in force.

Agents' debit balances are the result of advances to agents against anticipated future commissions. The practice of making advances to life insurance agents and charging the advances against the agents' anticipated commissions is widely recognized and established in the life insurance industry. Agents' debit balances represent an ordinary and necessary advance and outlay in carrying on petitioner's insurance business. Petitioner has the right to demand payment of the unpaid balance of advances to agents at the time of their discontinuation of representation of petitioner. It has been the policy of petitioner to obtain judgment against those agents with a substantial balance for advances where no arrangement has been made for, or there was refusal of, repayment and it appears that the agent might possibly have sufficient assets in the future to repay the balance of advances.

After annual chargeoffs for worthlessness, the agents' debit balances at December 31 of the indicated years were as set forth below opposite such year:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1955 | $42,951.85 | 1959 | $68,079.85 |
| 1956 | 64,917.16 | 1960 | 63,747.73 |
| 1957 | 75,768.23 | 1961 | 48,398.93 |
| 1958 | 70,751.42 | | |

Agents' debit balances charged off at the close of the indicated years are set forth below opposite such years:

| Year | Amount |
|------|--------|
| 1958 | $16,312.83 |
| 1959 | 8,742.55 |
| 1960 | 13,489.04 |
| 1961 | 24,145.23 |

In its annual statements for 1953 through 1955 petitioner did not show any agents' debit balances as assets. Its 1956 statement showed debit and credit balances but made no extension to nonadmitted assets. Its 1957 and 1958 statements showed agents' debit balances as nonadmitted assets in the respective amounts of $139,457.40 and $150,405.29. In no subsequent statements has it shown agents' debit balances as nonadmitted assets. With the advent of the Life Insurance Company Income Tax Act of 1959 petitioner commenced charging off agents' advances as they were made, maintaining only a memorandum account with respect thereto. Petitioner adopted this practice because it did not want to show agents' debit balances as nonadmitted assets because it was of the opinion that they had no real asset value and could not be used for credit purposes or otherwise.

Petitioner normally reinsures its risks with other companies and does not act as a reinsurer. However, it bought some policies from a local company and as a consequence assumed some reinsurance. The amount of accounts receivable from reinsurance assumed as of the end of the taxable year indicated was: 1959—$752.50, 1960—$300.

Petitioner had to set up a reserve for any liability involved in the reinsurance. The receivables are an accrual item.

OPINION

A tax is imposed on life insurance companies for the years 1958 and thereafter under the provisions of subchapter L, part I, section 801 *et seq.*, I.R.C. 1954, as amended by the Life Insurance Company Income Tax Act of 1959.[2] In general the law provides a three-phase tax base for life insurance companies; the first is on a portion of its investment income; the second is on one-half of the excess of its under-

---

[2] Pub. L. 86-69 (June 25, 1959), effective for taxable years beginning after Dec. 31, 1957.

writing (operating) income over its investment income; and the third is on the amount subtracted from the policyholder's surplus account for the taxable years. The various issues in this case are involved in determining petitioner's taxable investment income which is defined in section 804(a) (2) to be the sum of the life insurance company's share of all items of investment yield, reduced by certain items, plus, after 1961, the excess of long-term capital gains over net short-term capital losses. Under section 804(a) (1) the policyholder's shares of each item of investment yield of any life insurance company shall not be included in taxable investment income. The policyholder's share of any such item shall be that percentage obtained by dividing the policy and other contract liability requirements by the investment yield. Investment yield is defined in section 804(c) as gross investment income less certain deductions, and gross investment income is defined in section 804(b) as the sum of the gross income from (A) interest, dividends, rents, and royalties; (B) the entering into of any lease, mortgage, or other instrument or agreement from which the life insurance company derives interest, rents, or royalties; or (C) the alteration or termination thereof; and short-term capital gain and trade or business income.

The "policy and other contract liability requirements" used in determining the policyholder's shares of items of investment yield required to be excluded from the company's taxable investment income under section 804(a) (1) is defined in section 805(a) as including the adjusted life insurance reserves, multiplied by the adjusted reserves rate. The adjusted reserves rate is the average earnings rate, or, if lower, the current earnings rate. The current earnings rate, with which we are primarily concerned here, is determined under section 805(b) (2), by dividing the taxpayer's investment yield for the taxable year by the mean of the taxpayer's assets at the beginning and end of the taxable year. Fortunately, the issues remaining for our decision involve only the determination of whether certain items are to be included in taxpayer's "assets" for the years involved and, if so, the values thereof to be included.

Under section 805(b) (4) the term "assets" is defined as meaning—

all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. For purposes of this paragraph, the amount attributable to—
    (A) real property and stock shall be the fair market value thereof, and
    (B) any other asset shall be the adjusted basis (determined without regard to fair market value on December 31, 1958) of such asset for purposes of determining gain on sale or other disposition.

If the reader treads carefully through the maze of the above complex statutory provisions he will observe that it is to this taxpayer's advantage to establish that the items here involved were not "assets" or

to keep the value of the includable assets low. This is because the larger the average or current earnings rate is (determined by dividing investment yield by assets), the larger the policyholder's share of the investment yield is, and the lower the company's taxable investment income will be.

While it is difficult, under the statutory approach to this problem and unaided by much legislative history, to determine just where the emphasis should be placed in determining what should be included in the "assets" part of the formula and what should not be, we believe the main objective of the formula prescribed by the law in seeking to obtain an average or current earnings rate is to determine the relationship of the investment yield to the value of the assets which produced that yield; in other words the rate of return on the assets used to produce that return. We shall consider the individual items on that theory.

*Issue 1. Whether the home office property should be included in "assets" at its full stipulated value including the encumbrance, or at the stipulated value less the encumbrance*

Petitioner owned the home office property, subject to the mortgage thereon, and leased the entire property to its parent corporation. Petitioner took a sublease back from the parent for the 20 percent of the total rental space it occupied and used in the insurance business. Petitioner paid the installments of principal and interest on the mortgage.

It is stipulated that 80 percent of the entire rental value of petitioner's home office real estate was held and used by petitioner as an investment. We can assume from this that a fair rental on 80 percent of the entire value of the property was paid to petitioner by its parent company and was included in petitioner's gross investment income. There is nothing in the record before us to indicate that this rental or investment income was reduced in any amount because of the mortgage on the property, and such would not usually be the case. This being so, in order to determine the correct ratio of investment yield to the assets that produced it, the full value of the property, unreduced by the encumbrance, must be included in the denominator, or assets, part of the fraction.[3]

---

[3] Petitioner conceded on brief that it is not entitled to deduct from gross investment income in determining investment yield 80 percent of the interest paid on the mortgage indebtedness to which the real estate was subject. Respondent argued this issue in his opening brief, pointing out that on its returns petitioner had not only deducted the interest in computing investment yield but had also deducted the same interest in determining policy and other contract liability requirements, as called for in sec. 805(e), thus claiming a double deduction. This issue is no longer before us and we have made no effort to determine the validity of respondent's argument. However, we feel constrained to note that in the light of our conclusion on this first issue it would seem that the interest paid on the mortgage, which in effect is being used to purchase investment income, would be an expense of producing investment income.

Respondent's regulations support this conclusion. Section 1.805–5 (a) (4) (iii), Income Tax Regs., provides that for purposes of section 805 (b) (4) the amount attributable to real property shall be the fair market value thereof and, further, that in applying the provisions of section 805 (b) (4) and this subdivision, the fair market value shall not be reduced by the amount of any encumbrance, lien, mortgage, etc. This particular part of the regulation, as applied to the situation now under consideration, seems to be a reasonable interpretation and application of the statutory language to reach the objective sought, and we find no basis for not accepting it in this instance. The language of the statute itself provides for no exclusions but simply says that the amount attributable to real estate shall be the fair market value thereof.

Petitioner argues that since it has no obligation on the mortgage its only investment in the property is the amount it has actually paid for the property to date, which would not include any part of the unpaid principal on the mortgage; and that to pay off the mortgage in full, petitioner would have to liquidate other investment assets to do so. Be that as it may, we are not here concerned with petitioner's actual investment in the property, but rather with the relationship of the investment income to the investment assets which produced that income. Eighty percent of the entire value of the home office property was used to produce the investment yield, which is the numerator of the fraction, and it is only reasonable to include that 80 percent of the entire value of the property in the assets, which is the denominator of the fraction, in order to arrive at the true relationship, which is the current earnings rate.

Petitioner's reliance on *Standard Life Insurance Co. of America*, 13 B.T.A. 13, is misplaced. That case arose under provisions taxing life insurance companies contained in the Revenue Acts of 1921 and 1924, which spoke in terms of "book value of the mean of the invested assets." We there held that *book value* did not include a mortgage encumbrance. The present provision of the law refers to fair market value. Had Congress intended to include real estate in investment assets at book value it could easily have said so. We likewise find little support for respondent's position in *Crane v. Commissioner*, 331 U.S. 1, strongly relied upon by him. That case involved statutes and questions relating to basis, depreciation, and statutory construction supported by long-consistent administrative action to such an extent that its controlling application would not be possible here, where we have a highly technical and involved insurance problem.

Nevertheless, for the reasons stated above, we hold for respondent on this issue.

*Issues 2, 3, and 4. Whether net premiums deferred and uncollected, premiums due and unpaid, and loading are "assets" under section 805(b)(4)*

"Assets" are defined in section 805(b)(4) as all assets of the company other than real or personal property (excluding money) used by the life insurance company in carrying on its insurance trade or business.

As our findings of fact indicate, "net premiums" are the part of the premium intended to meet the cost of insurance, both current and future; "loading" is the additional amount to be paid by the insured for costs of administration, management, operating expenses, contingencies and profits; "net premiums" and "loading" constitute the "gross premium." "Premiums deferred and uncollected" are gross premiums not yet due to be paid under the terms of the policies; "premiums due and unpaid" are gross premiums due to be paid under the terms of the policies but which have not been paid. The "loading" with which we are here concerned is the "loading" included in the "gross premiums" above mentioned. As to all of the foregoing, there is no legal liability on a policyholder to make any payment of premiums which support them.[4] Should he fail to make payment of premiums, his policy is canceled. Nothing else can happen. No past or future liability exists. See *Connecticut General Life Ins. Co. v. Eaton*, 218 F. 188, affd. 223 F. 1022 (C.A. 2).

The ready and simple answer to whether these items can be "assets" is that they have no existence as an asset. They are not a chose representing a promise to pay. The policyholder cannot be sued for their payment. The items could not be discounted and they would not be accruable. They might be of value to petitioner in that a policyholder would be inclined to pay the premiums and continue their policies; but this would be too thin a reed to support including them as an "asset" for the purpose of computing the petitioner's "current earnings rate" in order to arrive at a rate of return on the company's investment assets. Moreover, under section 805(b)(4), which speaks in terms of adjusted basis for its "assets," there could be no basis for the items.

"Deferred and uncollected" premiums and premiums "due and unpaid" are special types of accounts that are used in life insurance

---

[4] Nash, Federal Taxation of Life Insurance Companies, sec. 18.03, states: "Deferred and uncollected premiums are only expectancies, at most. Since there is no duty to pay nor right to collect, it would seem that there is no assignable value to them. Unlike a normal account receivable where something has been exchanged or sold giving rise to a right to collect a debt, the insured has received no coverage and no debt has been created. Thus, there is no cost or other basis upon which to determine value. Neither party has performed any promise and the performance of the condition which creates the contract (premium payment) is within the discretion of the insured. This might be compared to a wage earner and his future salary. Only if he performs his work will he be entitled to wages. It would not be said that some future wage is an asset when nothing has been done to earn it. It would seem that the value of the future premium is zero and thus no asset exists of value. It is only in a theoretical sense that such premium might be termed an 'asset.' "

accounting as a technical correction of an overstatement of a reserve liability [5] resulting from the assumption that all premiums are collected in advance for the year. They are used to prevent distortion in the balance sheets. They are not tangible items and are not claims currently reducible to money. They do not currently yield any income. They cannot and are not used to produce investment income; and, under the theory stated in our opening discussion, should not be included in the formula used to determine the rate of return on the company's investment assets.

Respondent urges that because section 818(a)(1) of the Code provides that a life insurance company must compute its income on an accrual method of accounting the items in question must be accrued and as an accrued item are thus "assets" as defined in section 805(b)(4) and must be taken into account in computing the petitioner's "current earnings rate" under section 805(b)(2). The facts, however, give no justification for this. There being no liability upon the policyholders to make any premium payments, there can be no justification for their accrual. Absent an accrual in this situation, only resort to medieval metaphysics could translate the items in question into "assets." The fact that accounting problems have caused the items to be "deemed" assets cannot make them so in fact.

Although petitioner's accrual ledger in accounting for a premium payment on its face might be regarded as establishing the items in question as an "asset," we do not believe that it in fact does this. For example, we note the following entries for the first year's premiums (continued in the findings of fact for a period of years):

FIRST YEAR

12/1 First quarterly premium $5.62

*Cash ledger*
Debit cash $5.62  Credit premium income $5.62
*Accrual ledger*
Debit expense—increase in reserve $2. Credit mortality reserve $2
Debit deferred and uncollected premium $3.55, credit income—adjustment of deferred and uncollected premium $3.55
(Memo (gross deferred and uncollected) 16.86—loading 13.31—net 3.55)

3/1 Second quarterly premium $5.62

*Cash ledger*
Debit cash $5.62  Credit premium income $5.62
*Accrual ledger*
Debit income—adjustment of deferred and uncollected premium $1.18.
Credit deferred and uncollected premium $1.18.
(Memo (gross deferred and uncollected) 11.24—loading 8.87—net 2.37)

Although throughout the foregoing example of the petitioner's accounting treatment of its premiums there are references to "Cash

---

[5] The parties seem to have divergent views as to whether "loading" is included in the computation of the reserves, but inasmuch as we conclude that no part of these gross premiums are includable in "assets" we need not consider this dispute.

ledger," "Debit cash" and "Credit premium income," these were solely and purely bookkeeping matters. When the accruals were made for "net deferred and uncollected premium" account (life insurance), the "due and unpaid premium" account (health and accident insurance) and the loading, there was no cash involved in the picture, even though the account shows a "Cash ledger" with a "Debit of cash" and a credit of an equal amount of premium income. This accounting transpires because State insurance departments require that an addition to policy reserves must be made on the assumption that the entire annual premium has been or will be collected. This reserve is a balance sheet liability. In order to balance this entry an equal "asset" is entered, i.e., the "deferred and uncollected premium," the "due and unpaid premium" and the "loading." The entire "asset" is not really an asset, but it is in the nature of a "valuation" account to show the true extent of the reserve liability. The "asset" as shown above is gradually wiped out during the year when (as and if) the policy-holder pays the premium.

Respondent argues that under the statutory language and his regulations, these items must be included in "assets." Section 805(b)(4) of the Code does provide that "the term 'assets' means all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business." In section 1.805-5(a)(4)(i), Income Tax Regs., it is said that—

The following items are the only ones to be excluded from the term "assets" as being considered "used by the life insurance company in carrying on an insurance trade or business":

and thereafter are listed four groups of tangible assets including the home office, furniture and fixtures, supplies, and automobiles used in the conduct of its insurance business. Of course if the items here involved are not truly "assets" of the company, the statutory language and the above-quoted language from the regulations would not require their inclusion in the statutory formula.

However, in section 1.805-5(a)(4)(ii) of the regulations, respondent illustrates the above provision of the Code by an example which provides in part that—

Included in the statement of assets of P, a life insurance company, are the following items: * * * agents' debit balances, premiums deferred and uncollected and premiums due and unpaid * * *. Accordingly since * * * [the above items] are not considered as being used by P in carrying on an insurance trade or business, they are included within the term "assets" and, therefore, shall be taken into account by P in determining its current earnings rate.

To the extent the above provisions of the regulations are inconsistent with our conclusions herein we find they are arbitrary, unreasonable,

and an unduly restrictive interpretation of the statute, and are thus invalid. *Trust of Bingham* v. *Commissioner*, 325 U.S. 365; *Commissioner* v. *Acker*, 361 U.S. 87. We note with interest, however, that section 1.801–4(f), Income Tax Regs., provides:

(f) *Adjustments to life insurance reserves.* In the event it is determined on the basis of the facts of a particular case that premiums deferred and uncollected and premiums due and unpaid are not properly accurable for the taxable year under section 809, and, accordingly, are not properly includible under assets (as defined in section 805(b)(4)) for the taxable year, appropriate reduction shall be made in the life insurance reserves. This reduction shall be made when the insurance company has calculated life insurance reserves on the assumption that the premiums on all policies are paid annually or that all premiums due on or prior to the date of the annual statement have been paid.

Of course, there is no issue before us involving this last-quoted part of the regulation and we make no comment on either its validity or its application to this taxpayer.

*Issue 5. Whether agents' debit balances are "assets" for purposes of computing the mean of assets under section 805(b)(4), or whether they are, contrary to section 1.805(a)(4)(i), Income Tax Regs., assets used in carrying on an insurance trade or business*

As the findings of fact show, the petitioner, in accordance with an established practice in the life insurance business, makes advances to its agents against their future commissions for selling insurance. If an agent quits selling insurance for the petitioner, it is entitled to payment of the unpaid balances and it has a policy of obtaining judgments against such former agents if prospects for collection appear reasonable. Each yearend the indebtednesses which are found worthless are charged off.

For the years 1955 through 1961 (excepting 1958) the petitioner has not shown the agents' debit balances as "assets" on its NAIC forms.

For the taxable years in question (1958–61) the petitioner had agents' debit balances, due and owing, as follows:

| Year | Amount |
| --- | --- |
| 1958 | $70, 751. 42 |
| 1959 | 68, 079. 85 |
| 1960 | 63, 747. 73 |
| 1961 | 48, 398. 93 |

The petitioner has introduced no contracts between it and the agents delineating the rights of the respective parties with regard to the advances made to the agents or whether they bore interest. From the facts of record noted above, it is clear to us that the amounts in question were collectible accounts and, as such, "assets," with value.

The petitioner makes the argument that since it made these advances for the stipulated sole purpose of obtaining agents who will produce life insurance business, they are ordinary and necessary advances and outlays in carrying on petitioner's insurance business. This might be true, but what the petitioner overlooks is that for those accounts which have proved worthless it has taken a deduction, and as to the others the petitioner still has the collectible asset, which as a "nonadmitted" asset is nonetheless includable in the section 805(b)(4) computation. The "advances and outlays" are just that and the ones here in question are still collectible. They are "assets" comparable to bonds, stock, and mortgages.

While we recognize that there is some validity to petitioner's argument that these would not normally be the type of asset which would produce investment income, they admittedly are assets and we cannot, on this record, conclude that respondent's regulation, sec. 1.805–5(a) (4)(i), which specifically includes these items in assets, is an arbitrary and unreasonable interpretation of the statute. We hold for respondent on this issue.

*Issue 6. And finally, whether petitioner must include accounts receivable from "Reinsurance Assumed" in its computation of the mean of its assets under section 805(b)(4)*

This issue is whether "assets" includes in its section 805(b)(4) statutory meaning, accounts receivable from reinsurance assumed (purchased) by petitioner. Petitioner does not usually purchase policies and act as reinsurer. The accounts receivable amounted to $752.50 as of December 31, 1959, and $300 as of December 31, 1960. Petitioner had to set up a reserve for any liability occasioned by the reinsurance.

Here again the question is whether this subject matter is an "asset." We agree with respondent that it was. It, too, fits the definition for "assets" as all assets of the company (including nonadmitted assets) other than real and personal property used by it in carrying on an insurance business.

General accounting principles would designate "accounts receivable" as an "asset." Although not referred to in section 805(b)(4) and its regulation except in a catchall "all assets," it is somewhat akin to "bank accounts" as used in the regulations. The "asset" here is the amounts to be received from the reinsurance and as such could not be the "personal property" used by it to produce the income in order to fall within the exclusion of "property used by it in carrying on an insurance trade or business."

We hold for respondent on this issue.

*Decision will be entered under Rule 50.*