**JEFFERSON STANDARD LIFE INSUR-
ANCE COMPANY, Appellee,**

v.

**UNITED STATES of America,
Appellant (two cases).**

**JEFFERSON STANDARD LIFE INSUR-
ANCE COMPANY, Appellant,**

v.

**UNITED STATES of America,
Appellee (two cases).**

Nos. 12326–12329.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 31, 1968.

Decided March 13, 1969.

Fred W. Peel, Washington, D. C., and Wm. J. Adams, Jr., Greensboro, N. C. (Charles G. Powell, Jr., Adams, Klee-meier, Hagan & Hannah, Greensboro, N. C., and Miller & Chevalier, Wash-ington, D. C., on brief), for Jefferson Standard Life Ins. Co.

Thomas L. Stapleton, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty.

Gen., Lee A. Jackson and Gilbert E. Andrews, Attys., Dept. of Justice, and William H. Murdock, U. S. Atty., on brief), for United States.

Fred C. Scribner, Jr., Thomas C. Thompson, Jr., Washington, D. C., William C. Smith, Portland, Me., David A. Sutherland, Washington, D. C., and Bruch A. Coggeshall, Portland, Me., Scribner, Hall & Casey, Washington, D. C., and Pierce, Atwood, Scribner, Allen & McKusick, Portland, Me., on brief, for American Life Convention and Life Ins. Assn. of America as amici curiae.

Before BRYAN and WINTER, Circuit Judges, and McMILLAN, District Judge.

WINTER, Circuit Judge:

These appeals present myriad issues as to the application and interpretation of the Life Insurance Company Income Tax Act of 1959. 26 U.S.C.A. § 801 et seq.[1] For the taxable years 1958 and 1959 Jefferson Standard Life Insurance Company ("taxpayer" and sometimes "Jefferson") filed consolidated returns with its wholly-owned subsidiary Pilot Life Insurance Company ("Pilot"). After assessment and payment of taxes beyond those self-assessed, taxpayer filed timely suits for refund. From judgments favorable in part to taxpayer and favorable in part to the government, these appeals and cross-appeals for the two taxable years have been taken. We defer further statement on the facts until discussion of the issue to which they relate.

I

The Life Insurance Income Tax Act of 1959 was a comprehensive revision of the scheme of imposing income taxes on life insurance companies, other than mutual life insurance companies. In recognition that a part of the premiums charged, and a part of the income derived from investments, will be repaid to policyholders at a future date, in satisfaction of a contractual obligation, the Act purports to tax only the portions of premium income and investment income which represent profit to the company, available legally for distribution to policyholders or stockholders as dividends, as distinguished from those gains which, under state law, must be set aside to meet the company's future contractual obligations. "In arriving at taxable investment income and gain from operations, the 1959 Act, consistent with prior law in this regard, recognizes that life insurance companies are required by law to maintain policyholder reserves to meet future claims, that they normally add to these reserves a large portion of their investment income and that these annual reserve increments should not be subjected to tax." United States v. Atlas Life Ins. Co., 381 U.S. 233, 235–236, 85 S.Ct. 1379, 1381, 14 L.Ed.2d 358 (1965). To accomplish this objective, "[t]he Act establishes a statutory framework directed to the measurement of life insurance company total income on an annual basis for use in the application of an annual tax." Franklin Life Ins. Co. v. United States, 399 F.2d 757, 758 (7 Cir. 1968), cert den., 393 U.S. 1118, 89 S.Ct. 989, 22 L.Ed.2d 123 (March 3, 1969).

The determination of the final tax base, to which ordinary corporate rates of taxation are applied, involves a series of multiple computations which may be referred to as "phases." Phase I involves the measurement and determination of taxable investment income. § 804. The computations incident to Phase I are, in the main, devoted to dividing up the investment income for the taxable year between a nontaxable "policyholders' share," deemed necessary for policyholder reserve obligations, and a taxable "life insurance company's share." The division is made up by dividing the company's "investment yield,"[2] by the assets

---

1. The Act added numerous sections to the Internal Revenue Code of 1954. Further references in this opinion will be to the Internal Revenue Code of 1954, as added by Pub.L. 86–69 and later amended, except where specifically noted.

2. Investment yield is gross investment income, less specified deductions, including investment expenses, real estate expenses, depreciation, depletion and trade and business expenses, subject to certain exceptions and limitations. § 804(c).

of the company to produce an earnings rate. This rate, which is subject to a slight downward adjustment if the earnings rates in prior years are lower, is then multiplied by a figure representing the company's adjusted life insurance reserves[3] for policyholders. The product of the adjusted earnings rate and adjusted reserves equals the exclusion from taxes attributable to life insurance reserves.

The exclusion so obtained is then increased by additional sums attributable to special pension plan requirements and certain interest payments. The final total exclusion figure is referred to as total "policy and other contract liability requirements." § 805. The ratio of policy and other contract liability requirements to total investment yield constitutes the ratio upon which each and every item of investment yield is to be divided between the excludable policyholders' share and the company's share. The company's share constitutes the Phase I tax base.

The Phase II computation is directed to determining gain or loss from operations, and is intended to reflect the insurance company's income from *all* sources less certain specified deductions. These sources include premium or underwriting income. Premium income results when the price charged for the policy is in excess of the cost to the insurance company for providing the coverage, and such cost may be less than estimated, because actual mortality may turn out to be less than tabular mortality, and expenses incident to the sale and servicing of the policies may be less than estimated.

Under Phase II, all sources of company income are recognized. Items to be taken into account include the company's share of investment yield computed in a manner similar (but not identical) to its

computation in Phase I. The essential difference is that, for purposes of Phase II, the interest rates assumed by the company in setting up its reserves are used, rather than the actual earnings rates used in Phase I. This assumed rate is multiplied by a figure representing not only life insurance reserves, but reserves set aside for supplementary contracts without life contingencies, dividend accumulations, premiums paid in advance and premium deposit funds. § 810(c). The result, referred to as the share of investment yield set aside for policyholders (or the "required interest"), is subtracted from total investment yield. The remainder constitutes the company's share of investment yield for purposes of Phase II and is includable in the tax base. Also included in the Phase II base are gross premiums, decreases in certain reserves and other amounts not relevant here. § 809(c). The sum of these items constitutes gross income for purposes of Phase II.

From gross income, certain specified deductions are allowed. § 809(d). These include deductions for underwriting expenses, salaries and other operating expenses, as well as charitable contributions. Also included are deductions for losses on insurance and annuity contracts, as well as for the company's share of tax-exempt interest and dividends received. Additionally, the company is allowed a deduction for increases in reserves during the taxable year. § 809(d)(2). When the various deductions are taken, the final result is the gain or loss from operations—the Phase II tax base.

■ Life insurance company taxable income consists of (1) the smaller of taxable investment income or the gain from operations, plus (2) 50% of the excess, if any, of gain from operations over taxable investment income,[4] to which is

---

3. Life insurance reserves are the fund which, together with future premiums and interest, will be sufficient to pay future claims.

4. This unique tax advantage—taxation of only one-half of income—was allowed by

Congress in recognition of the difficulties of accurate establishment of insurance company annual taxable income and to compensate for the possibility that what may be considered taxable income in a given year may be required to ful-

added any amount subtracted from the policyholders' surplus account.[5] § 802 (b). This final amount is subject to taxes at normal corporate rates. § 802 (a) (1).

We turn to the particular problems which these cases present arising from application of the framework thus summarized.

## II

Prior to 1958, taxpayer acquired by purchase all of the outstanding stock of Pilot. During each of the years 1958 and 1959, Pilot paid cash dividends out of current earnings and profits to taxpayer in the amount of $1,250,000. For the years 1958 and 1959, these companies filed consolidated income tax returns. In both returns taxpayer and Pilot were treated as a single taxable entity. At every step in the computations required to determine the Phase I and Phase II taxable investment income, the figures for both companies were consolidated on an item-by-item basis, and there was eliminated from all computations the above-described investment of taxpayer represented by the Pilot stock, together with the dividends paid by Pilot to taxpayer.

The district court approved taxpayer's treatment of the consolidated returns and the elimination of the Pilot dividend. In this we think there was error, and on this issue we reverse.

Although the Act specifies how taxpayer's investment in other corporations and how dividends received by taxpayer from other corporations are to be treated, the Act makes no special provision for the treatment of dividends received by one life insurance company from its investment in another or the treatment of the investment of one life insurance company in another. Such a determination is, of course, crucial to the Phase I and Phase II computations which have been described.

The Treasury Regulations governing the filing of consolidated income tax returns antedate the Act. They provide that consolidated taxable income is the combined taxable income of the affiliated corporations and that the taxable income of each corporation shall be computed in accordance with the provisions covering the determination of taxable income of separate corporations except that "there shall be eliminated * * * dividend distributions from one member of the group to another member of the group." 26 C.F.R. § 1.1502–31A(b) (1) (i).[6]

While the Regulations establish the principle that intercompany dividends are to be eliminated, they do not establish how they are to be eliminated in the case of taxpayers under the Act, or, more specifically, at what stage of the Phase I and Phase II computations the elimination is to be made. We think that the answer is supplied by analogy to United States v. Atlas Life Ins. Co., *supra,* which considered a similar question in regard to tax-exempt interest on municipal bonds.

Before analyzing *Atlas,* we reiterate that the basic philosophy of the Act is to tax an insurance company only on the portion of its investment income not required to be set aside in a reserve for future policy liabilities. If Pilot's dividend to taxpayer is to be eliminated at the outset of the Phase I and Phase II

---

fill a policy liability in a subseqent year. S.Rep.No. 291, 86th Cong., 1st Sess., p. 7 (1959—2 Cum.Bull. 770, 775), U.S. Code Cong. & Admin.News 1959, p. 1575.

5. This amount constitutes distributions by the company to its stockholders in excess of amounts being taxed on a current basis. The method of computing this amount is specified in § 815. Since these cases present no question concerning computation of this amount, it need not be further described.

6. This specific provision of the Regulation is subject, however, to the general reservation that "[a]ny matter in the determination of which the provisions of the regulations * * * are not applicable shall be determined in accordance with the provisions of the Code or other law applicable thereto." 26 C.F.R. § 1.1502–3A. Manifestly, this reservation should be given wider latitude where, as here, the Regulation preceded the Act and the Act made fundamental changes in the mode of taxing life insurance companies.

computations, in effect, the Act would be construed as if liabilities to taxpayer's policyholders were to be satisfied solely by other income. Such a result does not comport with fact because both taxpayer's investment in Pilot and the income derived therefrom are available and legally liable for the satisfaction of taxpayer's liabilities to its policyholders.

*Atlas* approved the concept that tax-free income was to be afforded its immunity only to the extent of the "life insurance company's share," and that such immunity did not extend to the "policyholders' share," otherwise nontaxable. True, *Atlas* reached this result under sections of the Act which specifically deemed the interest on municipal bonds tax-free, but it did so in a context in which there was a colorable argument that the interest *constitutionally* was tax-free. We think that the same reasoning applies where, as here, the tax-exempt feature is supplied by the Regulation.

To turn specifically to *Atlas*, the questions presented were how to treat interest on municipal bonds which was rendered tax-free in the computation of taxable investment income by § 804(a) (6), and in the calculation of gain from operation by § 809(b) (4).[7] A second question presented was whether such treatment violated any implied constitutional immunity of interest on municipal bonds from income taxes. In arriving at its result, the Court pointed out that Congress properly treated a major portion of investment income not as income to a life insurance company, but as income to the policyholders[8] The Court then went on to approve the Act's allocation of a share of tax-free interest to the policyholders, with recognition of its tax-free character of only that part of the interest on municipal bonds which was allocated as the "life insurance company's share."[9] Thus, *Atlas* held that interest income which was exempt from taxation was exempt only to the extent that it constituted income to the life insurance company otherwise subject to tax.

■■ The rationale of *Atlas* is that the two formulae for determining the policyholders' share exclusion constitute only a measurement for tax purposes of the claim of each company's policyholders against its investment income. In applying these formulae, the tax-exempt character of the income is not recognized at the outset of the computation, but is recognized at its conclusion, when the life insurance company's share of investment income is determined. A life insurance company receives special and substantial tax benefit, based upon the concept of the division of its income in accordance with its own relationship to its policyholders. As a corollary, all of its investment income—intercorporate or

In any event, a regulation inconsistent, in whole or in part, with the Congressional language cannot stand, to the extent of the inconsistency.

7. Both §§ 804(a) (6) and 809(b) (4) specifically preserved the general exemption afforded interest on municipal bonds contained in § 103.

8. "An insurance company obtains most of its funds from premiums paid to it by policyholders in exchange for the company's promise to pay future death claims and other benefits. The company is also obligated to maintain reserves, which, if they are to be adequate to pay future claims, must grow at a sufficient rate each year. The receipt of premiums necessarily entails the creation of reserves and additions to reserves from investment income. Thus the insurance company is not only permitted to invest, but it *must* invest; and it *must* return to the reserve a large portion of its investment income. As no insurance company would deny, there is sufficient economic and legal substance to the company's obligation to return a large portion of investment income to policyholder reserves to warrant or require the exclusion of investment income as employed from the taxable income of the company. And we think the policyholders' claim against investment income is sufficiently direct and immediate to justify the Congress in treating a major part of investment income not as income to the company but as income to the policyholders." 381 U.S., at 247–248, 85 S.Ct. at 1387 (emphasis in original.).

9. "Under the 1959 Act this portion is arrived at by subjecting each dollar of in-

otherwise—is to be taken into account in computing the investment income and assets to which the policyholders of the life insurance company may look. We hold, therefore, that the intercorporate distributions rendered nontaxable by the regulation are only those intercorporate distributions which constitute a portion of the insurance company's share of investment income after the full intercorporate distribution has been included in the computation from which that share is determined.

### III

Taxpayer and Pilot made charitable contributions during the tax years in question. Both allocated the contributions between the investment and underwriting functions—the Phase I and Phase II computations. While the government does not challenge the reasonableness of the allocations, the government asserts that the entire amount of charitable contributions should have been deducted in the computation of underwriting income and no part was deductible as an investment expense.

The district court sustained taxpayer's position. We disagree, and on this issue of the case, we also reverse the district court.

While § 804(c) (1) broadly permits the deduction, inter alia, of "investment expenses" [10] from gross investment income in determining "investment yield," § 804, overall makes no specific mention of the deductibility of charitable contributions in determining taxable investment income—the Phase I computation. By contrast, § 809, which prescribes the Phase II computation—the determination of underwriting income or gain or loss from operations—specifically allows, inter alia, the deduction from the gross amount of premiums, etc., of "all other deductions allowed under this subtitle for purposes of computing taxable income to the extent not allowed as deductions in computing investment yield" in the determination of (§ 809(d) (12)) of "gain from operations." Section 809(d) (12) is, in turn, modified by § 809(e) (3), which states that the limit in applying § 170—the general statute allowing deductions for charitable contributions—"shall be 5 percent of the gain from operations" computed without regard to certain items not relevant here. Without more, a comparative reading of these statutes leads to the inference that Congress intended that charitable deductions be recognized—and recognized solely—in the computation of gain from operations and not recognized in the computation of the life insurance company's share of investment income.

To escape this result, taxpayer advances three arguments, none of which we think possesses merit. First, we do not find persuasive the argument, which taxpayer seeks to bolster by reference to New World Life Ins. Co. v. United States, 26 F.Supp. 444 (Ct.Cl.1939), aff'd, 311 U.S. 620, 61 S.Ct. 314, 85 L.Ed. 393

vestment income, whatever its source, to a pro rata share of the obligation owed by the company to the policyholders, from whom the invested funds are chiefly obtained. In our view, there is nothing inherently arbitrary or irrational in such a formula for setting aside that share of investment income which must be committed to the reserves. Undoubtedly policyholders have not contracted to have assigned to them either taxable or exempt dollars. Their claim can be fully satisfied with either, but it runs against all investment income, whatever its source. We see no sound reason, legal or economic, for distinguishing between the taxable and nontaxable dollar or for

saying that the reserve must be satisfied by resort to taxable income alone. Interest on municipal bonds may be exempt from tax, but this does not carry with it exemption from the company's obligation to add a large portion of investment income to policyholder reserves." (footnote eliminated.) 381 U. S., at 249, 85 S.Ct. at 1388.

10. Section 804(c) (1) adds: "If any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed * * *." The Regulations define "general expenses," generally, as "any expense paid or incurred for the

(1940), that charitable contributions are "general expenses." Prior to the enactment of the 1939 Internal Revenue Code, charitable contributions were considered general expenses, but with the enactment of that Code, they were excluded from the category of expenses otherwise deductible as ordinary and necessary business expenses and made the subject of separate treatment. Jefferson Mills, Inc. v. United States, 259 F.Supp. 305, 311 (N.D.Ga.1965), aff'd, per curiam, 367 F. 2d 392 (5 Cir. 1966).

That under current law a charitable deduction is a charitable deduction and not a general expense is the stumbling block which destroys taxpayer's second argument that charitable deductions are not controlled solely by § 809(d) (12) because that section purports to apply only to deductions "to the extent not allowed as deductions in computing investment yield." The implied exclusion in § 809(d) (12) is meaningless here, because there is no basis to say that a charitable deduction is allowable under § 804, the investment yield provision. The "to the extent, etc." language, rather than implying that something allowable under it must also be allowable under § 804, means simply that an item allowed under other provisions may not be allowed a second time under it.

Taxpayer's third argument is that allocation of charitable deductions between gross investment income and gross gain from operations is recognized by the method of accounting prescribed by the National Association of Insurance Commissioners (NAIC) in accordance with which taxpayer makes reports to the states which regulate its operations and which taxpayer followed strictly in preparing its tax returns for the years in question. This argument is also made with regard to other issues in these cases and merits full consideration.

The district court held that the "form of the Annual Statement prescribed by N. A. I. C. may only be used * * * in computing taxable income when it does not conflict with an accrual method of accounting and is not inconsistent with the provisions of the Internal Revenue Code or the regulations thereunder." To like effect is Franklin Life Ins. Co. v. United States, supra, at p. 760. We think the district court was correct.

Section 818(a) permits resort to methods of computation as approved by NAIC for required annual statements provided that the computations be made on an accrual basis or another method fixed by the Regulations combining the accrual and other forms of accounting (and except the cash receipts and disbursement method).[11] Nothing in the legislative history of § 818(a) indicates that annual statement computations have other than a limited role—that they may be used only when "not inconsistent with the provisions of the 1954 Code and an accrual method of accounting."[12] A text writer is candid in admitting, as a general proposition, that there "are several areas where differences exist between the accrual basis used for the annual statement and the general rules of ac-

benefit of more than one department of the company * * *." 26 C.F.R. § 1.-804–4(b) (1) (ii).

11. "§ 818. Accounting provisions
   (a) Method of accounting.—All computations entering into the determination of the taxes imposed by this part shall be made—
      (1) under an accrual method of accounting, or
      (2) to the extent permitted under regulations prescribed by the Secretary or his delegate, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursement method).
   Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners." (emphasis supplied.)

12. H.Rep.No. 34, 86th Cong., 1st Sess., p. 42 (1959–2 Cum.Bull. 736, 766); S. Rep.No. 291, 86th Cong., 1st Sess., pp. 72–73 (1959–2 Cum.Bull. 770, 823), U.S. Code Cong. & Admin.News 1959, p. 1649.

crual for tax purposes" because "the emphasis of the annual statement has been on the solvency of the company." [13] And the life insurance industry itself has recognized that the differences are so marked that revision of the annual statement blanks to conform to tax accounting concepts is precluded.[14]

■ We think that the conclusion in *Franklin Life* with regard to "loading" is equally applicable to charitable deductions:

> "The careful and detailed attention given by Congress throughout Sections 801 through 820 to definition of the particular items utilized as factors in the tax formula *and in specifying and enumerating the permissible deductions and exclusions negates the existence of any intent on the part of Congress to relegate the substantive matter* of offsetting or excluding loading on deferred and uncollected premiums, with its concomitant impact on the resulting tax, *to the NAIC."* (emphasis supplied.) Franklin Life Ins. Co. v. United States, *supra,* p. 760.

We thus conclude that the NAIC form cannot create an extra-statutory deduction for charitable contributions.

## IV

Taxpayer and Pilot "strengthened" all life reserves in the year 1959. This is to say, the reserves for life insurance policies were increased. Increases in life insurance company reserves may be attributable to additions required when a method or assumption used by the insurance company is changed so as to produce a higher reserve, as well as normal additions made each year to meet existing and increasing obligations under policies in force. It was the former method, commonly called "reserve strengthening," which taxpayer and Pilot pursued.

The 1959 reserve strengthening included nonparticipating contracts, which are life insurance contracts in which the policyholders do not participate in company earnings or receive dividends.

At issue is the question of what portion of the reserve strengthening for nonparticipating contracts for 1959 is deductible in that year in the computation of gain or loss from operations (the Phase II computation). The question arises because § 809(d) (5) permits, so far as relevant here, the deduction from gross gain for operations of 10% of the increase for the taxable year in the reserves for nonparticipating contracts.[15] Section 810(d) establishes the so-called "spread rule," and it requires that certain increases in reserves may be taken into account only to the extent of $\frac{1}{10}$th of the increase for each of the *succeeding* ten taxable years following the year in

13. Denny and Rua, Federal Income Taxation of Insurance Companies (1961), p. 9.3.

14. II Proceedings of the National Association of Insurance Commissioners (1963), pp. 445–447.

15. The text of the language of § 809(d) (5) permitting the deduction from gross gain from operations is as follows:
    "(5) Certain nonparticipating contracts. —An amount equal to 10 percent of the increase for the taxable year in the reserves for nonparticipating contracts or (if greater) an amount equal to 3 percent of the premiums for the taxable year (excluding that portion of the premiums which is allocable to annuity features) attributable to nonparticipating contracts (other than group contracts) which are issued or renewed for periods of 5 years or more. For purposes of this paragraph, the term 'reserves for nonparticipating contracts' means such part of the life insurance reserves (excluding that portion of the reserves which is allocable to annuity features) as relates to nonparticipating contracts (other than group contracts). For purposes of this paragraph and paragraph (6), the term 'premiums' means the net amount of the premiums and other consideration taken into account under subsection (c) (1)."
    It will be noted that ¶ 5 states the permissible deduction as the greater of 10% in the reserves or 3% of the premiums attributable to the increase in the reserves. In this case, it is not disputed taxpayer and Pilot are entitled to use only the measure of 10% of the increase in the reserves.

which the increase is experienced.[16] Thus, to be decided is the question of whether § 810(d) is applicable to the special situation for which provision is made in § 809(d) (5), or whether § 809 (d) (5) is to be applied without reference to § 810(d).[17]

The district court concluded that the § 809(d) (5) deduction based upon 10% of increase in reserves for nonparticipating contracts is not subject to the § 810 (d) "spread rule" to the extent that such increase was attributable to reserve strengthening.[18] We think the district court was correct.

At the outset, we note that § 809(d) (5) makes no reference to § 810. By contrast, § 809(d) (2), which permits deductions for the "net increase in reserves" limits the deduction to that "required by section 810 to be taken into account for purposes of this paragraph." Manifestly, § 810(d) refers to all types of increases in reserves, and is not limited to the strengthening of reserves *for nonparticipating contracts*. Hence, as a matter of statutory construction, § 810 may, but need not, refer to § 809(d) (5) and, if § 810 is held not to apply to § 809 (d) (5), the former is not rendered nugatory.

From the reference in § 809(d) (2) to § 810, and the absence of such a reference in § 809(d) (5), we conclude that the "spread rule" prescribed by § 810(d) is not applicable to the special deduction for strengthening reserves for nonparticipating contracts permitted by § 809 (d) (5). Our conclusion is supported by the legislative history of § 809(d) (5). In regard to it, the Senate Finance Committee stated its support of the proposal, which originated in the House, as follows:

"Policyholder dividends in part reflect the fact that mutual insurance is usually written on a higher initial premium basis than nonparticipating insurance, and thus the premiums returned as policyholder dividends, in part, can be viewed as a return of redundant premium charges. However, such amounts provide a 'cushion' for mutual insurance companies which can be used to meet various contingencies. To have funds equivalent to a mutual company's redundant premiums, stock companies must maintain relatively larger surplus and capital accounts, and in their case the surplus generally must be provided out of taxable income. To compensate for this, the House bill allows a deduction for nonparticipating insurance equal to 10% of the increase in life insurance reserves attributable to nonparticipating life insurance (not including an-

---

16. The text of § 810(d) is as follows:

"(d) Adjustment for change in computing reserves:

(1) In general.—If the basis for determining any item referred to in subsection (c) as of the close of any taxable year differs from the basis for such determination as of the close of the preceding taxable year, then so much of the difference between—

(A) the amount of the item at the close of the taxable year, computed on the new basis, and

(B) the amount of the item at the close of the taxable year computed on the old basis as is attributable to contracts issued before the taxable year shall be taken into account for purposes of this subpart as follows:

(i) if the amount determined under subparagraph (A) exceeds the amount determined under subparagraph (B),

*1/10 of such excess shall be taken into account, for each of the succeeding taxable years, as a net increase to which section 809(d) (2) applies;* or

(ii) if the amount determined under subparagraph (B) exceeds the amount determined under subparagraph (A), 1/10 of such excess shall be taken into account for each of the 10 succeeding taxable years, as a net decrease to which § 809(c) (2) applies." (emphasis supplied.)

17. The Regulations, 26 C.F.R. § 1.809–5 (a) (5) (b) (iii) require that 10% of the increase resulting from the strengthening of reserves for nonparticipating contracts be amortized over a ten-year period as required by § 810(d).

18. The holding of the district court invalidated the portion of the Regulations referred to in footnote 17, *supra*.

nuities). Your committee has recognized the validity of the reasons for providing such a deduction and has therefore continued it in your committee's version of the bill. * * *" S. Rep. No. 291, 86th Cong., 1st Sess., (1959–2 Cum.Bull. 786), U.S.Code Cong. & Admin.News 1959, p. 1597.

An earlier significant statement contained in the report follows:

"Thus, a special 10 percent reduction is allowed with respect to the reserves on nonparticipating life insurance business (or, alternatively, a deduction of 3 percent of the premiums on these policies). This deduction is designed to compensate stock life insurance companies for the fact that they do not have the 'cushion' of redundant premiums (which, if the business does not got well, a mutual company can use to offset losses but otherwise are subsequently paid back as policyholder dividends)." S.Rep. No. 291, 86th Cong., 1st Sess. (1959–2 Cum.Bull. 778), U.S.Code Cong. & Admin.News 1959, p. 1586.[19]

■ Income tax laws are not always designed with the same reason and logic brought into play in other branches of the law, such as the test of the reasonable man in the law of torts, but reason and logic support the result which we reach. If increases resulting from the strengthening of reserves for nonparticipating contracts were held subject to § 810, the amount deductible in any year following that in which the increase was experienced would be 1/10 of the 10% of such increase rendered deductible by § 809(d)(5). Yet, in the case of other increases in reserves, including increases from the strengthening of reserves for participating contracts, the full amount of the increase would be deductible over a period of ten years. It would seem more reasonable to us that if Congress concluded to permit only 10% of the increases in reserves from nonparticipating contracts to be deductible, there would be little need for application of the spread rule. Therefore, reason would seem to indicate that the spread rule was to come into play only when the deduction was more substantial in nature. Especially is this so when Congress appeared to be concerned with the redundancy in the premiums charged by mutual insurance companies and their ability to reduce their tax obligations as compared to a stock company which would need real incentive to strengthen reserves at the expense of its surplus.

V

When taxpayer filed consolidated income tax returns with Pilot, its wholly-owned subsidiary, for the years 1958 and 1959, it computed its tax according to the

---

19. An apparently conflicting statement was also contained in the report. As cited by the government, the report discussed reserves strengthening or weakening, and said:

"8. Reserves strengthening or weakening.—A special spread rule is applied under the House bill and your committee's bill where a company determines that its reserves require strengthening and additions are therefore made to its reserves. If no limitations were imposed in these cases, the company could take a substantial additional deduction in computing gain or loss from operations for the year when the reserves were strengthened. To spread the effect of such adjustments, it is provided that, in the case of reserve strengthening, deductions relating to the additions in reserves are to be taken into account ratably over a 10-year period instead of entirely in the year of change. Conversely, in the case of reserve weakening, the increases in income relating to the reductions in reserves are to be taken into account over a 10-year period." S.Rep. No. 291, 86th Cong., 1st Sess., (1959–2 Cum.Bull. 794), U.S.Code Cong. & Admin.News 1959, p. 1608.

The quoted language does not purport to be confined to strengthening of reserves for nonparticipating contracts. Indeed, it does not even employ the phrase. A reading of the report as a whole leads us to conclude that the quoted language referred to strengthening or weakening reserves generally and was not intended to override or limit the discussion of special treatment of strengthening reserves for nonparticipating policies quoted in the text.

rates specified in the corporate income tax returns for life insurance companies. Those rates were 2% higher for life insurance companies filing consolidated returns than for life insurance companies filing separate returns. At a later date, taxpayer took the position that life insurance companies are entitled to file consolidated returns without payment of the 2% higher rate. This legal issue was resolved against taxpayer by the district court, and we think correctly so.

Section 802(a) (1), before it was amended in 1964,[20] imposed a tax on the taxable income of every life insurance company and provided that "[s]uch tax shall consist of—(A) a normal tax on such income computed at the rate provided by section 11(b), and (B) a surtax, on so much of such income as exceeds $25,000, computed at the rate provided by section 11(c)." Section 11 is divided into several subsections. Section 11(a) imposes a tax "for each taxable year on the taxable income of every corporation. The tax shall consist of a normal tax computed under subsection (b) and a surtax computed under subsection (c)." Section 11(c) prescribes that the surtax shall be "equal to 22 percent of the amount by which the taxable income * * * exceeds $25,000." Section 11(d) specifically excepts from the application of § 11(a) corporations subject to a tax imposed by § 801 et seq. (life insurance companies). However, for the years in question[21] § 1503 provided that in any case in which a consolidated return was made or required to be made " * * * the tax imposed under section 11(c) * * * shall be increased for any taxable year by 2 percent of the consolidated taxable income of the affiliated group of includible corporations."

The basic argument advanced by taxpayer is that, since § 1503 refers to the tax "imposed under section 11(c)" and since the tax upon life insurance companies is *imposed* by § 802, with only a cross-reference to § 11(c) to determine the manner of computation, the taxpayer does not fall within the "tax imposed under section 11(c)" language of § 1503 for purposes of the additional 2% tax.

Literal acceptance of taxpayer's argument would render § 1503 a complete nullity because § 11(c) does not *impose* the surtax; the surtax is imposed by § 11(a) and § 11(c) merely states the method of computation of its amount. We do not find convincing the government's argument that "imposed under section 11(c)" is broader than the more usual language of "imposed by" and no authority to support this conclusion is cited. *Cf.*, United States v. Wigglesworth, 28 Fed.Cas. 595, 596, No. 16,690 (Cir.Ct.D.Mass.1842). Overall, however, we think that the arguments on this point are overtechnical and overrefined.

The basic purpose of enactment of the Act was to establish "a statutory framework directed to the measurement of life insurance company total income on an annual basis for use in the application of an annual tax." Franklin Life Ins. Co. v. United States, *supra*. Substantial concessions were made to life insurance companies to insure that only income not presently or prospectively needed to meet policy liabilities would be taxed, but with respect to life insurance company taxable income the intent of Congress that life insurance companies be taxed at the same rate as other corporations was oft expressed. Both the House and Senate Reports emphasize that the rate of tax on

20. Section 802(a) (1) was amended by the Revenue Act of 1964, § 235(c) (1), 78 Stat. 126, and presently provides, in pertinent part, that the tax upon life insurance company taxable income "shall consist of a normal tax and surtax computed as provided in section 11 as though the life insurance company taxable income were the taxable income referred to in section 11." The legislative history of this revision refers to it mere-

ly as a "technical amendment." H.R. Rep. No. 749, 1 U.S.Code Cong. & Ad. News, p. 1639 (1964). Thus, the 1964 amendment sheds little light upon the proper interpretation of the pre-1964 version of § 802(a) (1) with which we are herein concerned.

21. The 2% increase in surtax was eliminated in 1964 by Pub.L. 88–272, § 234 (a).

life insurance companies was to be "a normal tax on such income, computed at the regular corporate normal tax rate provided by section 11(b) of the 1954 Code, and * * * a surtax * * * computed at the regular corporate surtax rate provided by section 11(c)." [22] Indeed, the Congressional intent could not be more clearly stated than as set forth in Senate Report No. 291, 86th Cong., 1st Sess., p. 127 (Supplemental Views on H.R. 4245):

> "After a determination of the proper tax base, the life insurance company would be taxed on its corporate profits *at current rates as is any other corporation. To do less would be unfair to other taxpayers who would be thus required to bear a disproportionately greater share of the tax burden."* (emphasis supplied.) U.S.Code Cong. & Admin.News 1959, p. 1658.

We conclude that the only reasonable overall interpretation of the statutory language is that when the surtax imposed by § 11 on ordinary business corporations was increased by § 1503, that increase was equally applicable to life insurance companies by virtue of the provisions of § 802(a) (1). It seems to us that the cross-reference to § 11(c), the computation subsection of § 11, contained in § 1503, indicates that the increase in rates provided for in § 1503 was applicable to any taxpayer for which the rates of tax previously established by § 11(c) were applicable. Taxpayer was within that group. Certainly, the legislative history of § 802(a) (1) does not indicate that taxpayer was to receive treatment any different, and specifically, taxed at any different rate, from that afforded non-life insurance company taxpayers. Equally certain, § 1503 should not be rendered meaningless in regard to all classes of taxpayers.

## VI

We are next concerned with whether, in determining gain from operations under § 809, taxpayer may take a deduction for "increase in loading on deferred and uncollected premiums," and whether, in determining investment income under §§ 804 and 805, taxpayer is entitled to exclude "loading on deferred and uncollected premiums" from its assets.

The gross annual contract premium, which is the beginning point for computing "gain from operations" under § 809, is the amount paid by an insured to the taxpayer for coverage for a full policy year. The gross contract premium is made up of two parts, a net valuation portion and a loading portion. The net valuation portion (sometimes called the net valuation premium) is the amount which, on the basis of legally required interest and mortality assumptions, is estimated to be required each year for reserves for policyholder claims. The difference between net valuation premium and the gross contract premium is referred to as the "loading." A purpose of loading is to pay for expenses incurred in writing and caring for the policy and to provide a margin for possible contingencies.

Although many insureds pay their gross contract premium in one lump sum annually, it is not unusual for an insured to pay the gross contract premium in semi-annual, quarterly or monthly installments over the policy year. As a result, portions of gross contract premiums may remain outstanding and not as yet received by taxpayer as of the end of the taxable year. Deferred payments are the portions of gross contract premiums on policies with premiums payable in installments that become due after December 31 of the calendar year and before the next policy anniversary date. Uncollected premiums are annual or installment premiums which, as of December 31 of a calendar year, have become due but have not as yet been paid. Usually the insured has a 31-day grace period after the due date in which to make payment and retain his rights under the policy.

---

22. H.Rep. No. 34, 86th Cong., 1st Sess., p. 23 (1959–2 Cum.Bull. 736, 752); S. Rep. No. 291, 86th Cong., 1st Sess., p. 44 (1959–2 Cum.Bull. 770, 802), U.S. Code Cong. & Admin.News 1959, p. 1619.

Taxpayer does not have a legal right to collect the portions of gross contract premiums referred to as deferred and uncollected. If the insured fails to make payment, however, the insurance coverage lapses. The life insurance reserves on taxpayer's policies are computed on the assumption that on each policy anniversary date the full annual gross contract premium has been received. This assumption is applied to policies having deferred and uncollected premiums. Taxpayer assumes it has a full year's liability for insurance coverage under these policies and credits the reserves which are reflected for tax purposes with the entire annual net valuation premium.

For purposes of the NAIC form, taxpayer includes in premium income the gross contract premiums on policies in force, including the deferred and uncollected portions thereof, but it deducts all annual costs incurred in servicing the policies and thereafter takes a further deduction for "increase in loading on deferred and uncollected premiums." On its federal tax returns taxpayer proceeded by the same method. The deduction was denied by the Commissioner and disallowed by the district court.

For purposes of the NAIC form, taxpayer included in assets only the gross contract premium net of the loading on the uncollected portion, i. e., the deferred net valuation portion of the gross contract premium. The district court, however, held that the taxpayer is required, for purposes of §§ 804 and 805, to treat the entire gross contract premium as an asset without any reduction for "increase in loading" on deferred and uncollected premiums.

We affirm the district court. In Franklin Life Ins. Co. v. United States, *supra*, it was held that for purposes of §§ 804 and 805 the taxpayer was required to compute "investment income" by including deferred and uncollected premiums (including loading) in its assets. But see, Western Nat. Life Ins. Co. v. Commissioner, 50 T.C. 285 (1968).[23] This conclusion stemmed in part from the Court's holding that in computing "gain from operations" in accordance with § 809 the taxpayer was obliged to include deferred and uncollected premiums (including loading) in gross premiums, because Congress would not be presumed to have contemplated a dual standard of tax accounting. The conclusion with regard to § 809 was based in large part on taxpayer's concession that "the intent and purpose of the Act require that the deferred and uncollected premiums be included in income on a gross basis (which includes loading)" coupled with the failure of Congress in enumerating deductions from gross income to authorize any deduction for loading.

Taxpayer has not made the concession made in *Franklin Life* and it vigorously contends that for that reason the holding in that case is not only distinguishable but also incorrect. It asserts that the failure of Congress to authorize a deduction for loading in § 809(d) is of no significance; rather, so the argument runs, the treatment of loading by the NAIC form, which has been the industry standard since 1951, is determinative and was

**23.** In Western Nat. Life Ins. Co. v. Commissioner, 50 T.C. 285 (1968), the court held that deferred and uncollected premiums should be excluded entirely from assets for purposes of the computations required by §§ 804 and 805 on the theory that only such assets which actually produced investment income, as opposed to mere bookkeeping entries, should be included.

At the behest of the Commissioner and in response to *Franklin Life*, the Tax Court once again entered upon what it described as "this fantasy world of life insurance company accounting and taxation." The result was a modification of the court's original views, which brings them into line with the position adopted by the taxpayer in the instant case. In particular, the Tax Court held that deferred and uncollected premiums *net of loading* should be included in assets. Western Nat. Life Ins. Co. v. Commissioner, 51 T.C. No. 81 (1969). For the reasons stated in the text, we adhere to the result reached in *Franklin Life* and by the district court.

accepted by Congress in enacting § 809 (c).[24] In this connection, it is said that exclusion of loading is in the nature of an adjustment, not a deduction, and the failure of § 809(d) to make mention thereof unexceptional.

The question is not totally free from doubt, but we incline to the government's view. We have already stated our views with regard to the limited function of NAIC treatment in the taxation of life insurance companies. Section 809(c) does permit certain adjustments to gross premiums, but, significantly, it provides for no adjustment for loading. Certainly, § 809(d) provides no deduction therefor.

■ Taxpayer credits reserve liabilities for tax purposes with a full policy year's net valuation, even though it had not received (and had no legal right to receive) all of the premiums therefor, and it does not dispute that it was required to take into account that part of the gross annual premium (exclusive of loading) which was deferred and uncollected. Section 818(a) specifies an accrual basis method for reporting of life insurance company income. Presumably, taxpayer is not required to include in income amounts which it has not received or which it has no right to receive; similarly, it is not entitled to deduct an expense of liability which it has neither paid nor incurred. Symmetry would require, however, that both sides of the equation by which taxable income is determined be treated alike. Thus, if taxpayer treats its reserve liabilities for tax purposes with a full year's net valuation (an item deductible under § 809(d) (2)), even though it had not received and had no legal right to receive all of the premiums therefor, it should be required to include gross annual premiums, including loading as the gross income figure under § 809(c) (1), without deduction for load-

ing on deferred and uncollected premiums since § 809(d) provides no deduction therefor.

Similarly, gross premiums should be included in assets for purposes of the investment income formula under § 804. NAIC treatment is not determinative when the Act prescribes different treatment. If the full annual net valuation premium is treated as a reserve liability under § 804, the corresponding asset should be the gross annual premium (including loading); else the formula is unbalanced to the unwarranted benefit of taxpayer. The justness of this conclusion is recognized by the life insurance industry itself.[25]

Regulation 1.805–5(a) (4) (ii) Example (1), and Regulation 1.809–4(a) (1) (i), applicable to taxable years beginning after December 31, 1957, but not adopted until January 19, 1961, are in accord with the conclusions we reach in regard to the inclusion of gross premiums in assets for purposes of § 805, and the inclusion of gross premiums without deduction or adjustment for loading on deferred and uncollected premiums for purposes of § 809, respectively. Concluding as we do that the taxpayer in *Franklin Life* conceded no more than what the law required, we rely on the decision therein in support of our views.

### VII

■ The *Franklin Life Insurance Company* case is also dispositive of the issues involving the treatment of interest on loans to policyholders.

By the terms of taxpayer's policy loan agreements a policyholder who borrows money from taxpayer in connection with a specific life insurance policy is required to pay the interest "annually in advance" on the policy anniversary date. In the event that an insured does not pay the

**24.** A general statement of the Secretary of the Treasury to the effect that the starting point for measuring net earnings should be the figure appearing in each company's annual statement is cited in support. House Committee on Ways and Means, Hearings on Taxation of Income of Life Insurance Companies, 85th Cong., 2d Sess., p. 4 (1958).

**25.** Wightman, Life Insurance Statements & Accounts (1952), pp. 44–46.

annual interest as required on the due date, the policy loan agreement requires that the interest be capitalized and thus added to the principal of the loan, bearing interest thereafter at the agreed upon rate.

Taxpayer in its own records distinguished between interest deemed "earned" and interest deemed "unearned." Where a policy anniversary date with regard to a policy securing a loan fell at some portion of the year other than December 31, taxpayer adjusted its records as of December 31 to show what portion of the interest had been earned during the taxable year and what portion was unearned. If the annual interest was in default and had been added to the principal of the policy loan then, as of December 31, taxpayer would prorate the interest as of December 31 to show the amount earned to that date, deferring recognition of the balance for income purposes until the following year. In the event that the policyholder repaid the principal of the loan during the policy year taxpayer refunded the portion of the annual interest deemed unearned at that point to the policyholder, and where the amount deemed unearned had already been added to the policy loan principal, taxpayer, in the event of repayment of principal, credited the policyholder with the "unearned" portion of such interest.

On its tax returns for the years in suit, taxpayer, in computing its taxable investment income, sought to reflect only the interest it deemed "earned" as income, and to defer recognition as income of the remainder of the interest actually received or added to policy loan principal until the succeeding taxable year. The district court disallowed taxpayer's payment and held that both the full amount of interest actually received and interest added to policy loan principal must be recognized as income in the years received or added to the principal.

We affirm on the authority of Franklin Life Ins. Co. v. United States, *supra*. See, in addition, Schlude v. Commissioner, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed. 2d 633 (1963).

## VIII

Whether agents' debit balances are to be treated as assets for purposes of § 805(b) (4) in the computation of taxable investment income is the next issue we must decide. Neither taxpayer nor Pilot treated agents' debit balances as assets for purposes of § 805(b) (4). The district court sustained the Commissioner's determination that they should have been included, and we affirm.

Agents' debit balances are the result of charges to the accounts of insurance agents made against future commissions. Jefferson did not make any cash advances to agents; Pilot, however, would advance money to its agents to provide for their living expenses until their commission income was sufficient to support them. Both Jefferson and Pilot also debited agents' accounts for various other charges, fees charged by reason of the cancellation or nondelivery of insurance policies within a specified time after they were written by the agent, charges for premiums on health and disability insurance on agents and their dependents, and, in the case of Jefferson, withholding taxes and charge-backs of commissions previously paid with respect to policies subsequently cancelled.

Although Jefferson, and apparently Pilot, had a contractual right to charge its agents interest on the amounts of the agents' debit balances, neither Jefferson nor Pilot did so. When an agent terminated his connection with the company at a time when a debit balance existed in his account, Jefferson and Pilot would apply commissions to which the agent subsequently became entitled against the debit balances. After such application no attempt was made, however, to collect any remaining debit balance in the account from a former agent. When an agent left the employment of either company leaving a debit balance on his account and there were no further commissions due to that agent, each company charged the agent's uncollected balances to general insurance expenses. The large percentage of the debit balances of Pi-

lot's agents represented amounts owed by agents who were still agents of Pilot at the end of the year, apparently because Pilot made cash advances to them. The NAIC annual statement calls for the amount of agents' debit balances to be shown as a nonadmitted asset.

Section 805(b) (4) defines the term "assets" to mean "all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business." Section 805(b) (4) also provides that the amount attributable to real property and stock shall be the fair market value thereof and any other asset shall be valued at the adjusted basis (determined without regard to fair market value on December 31, 1958) of such asset for purposes of determining gain on sale or other disposition. Regulation § 1.805–5(a) (4) (i) defines the assets excludable because they are "used by the life insurance company in carrying on an insurance trade or business" as limited to (1) home office and branch office buildings owned and occupied by the life insurance company, (2) furniture and equipment owned by the life insurance company and used in the home office and branch office buildings occupied by the life insurance company, (3) supplies, stationery and printed matter used in the operations conducted in the home office and branch office buildings occupied by the life insurance company and (4) automobiles and other depreciable property used in connection with the operations conducted in the home office and branch office buildings occupied by the life insurance company. Thus, the regulation does not treat agents' debit balances as assets of the company used by it in carrying on an insurance trade or business; indeed, the

first example given to illustrate the application of the rule in § 1.805–5(a) (4) (ii) specifically includes agents' debit balances among other items of property which are "assets" as defined by § 805 (b) (4), because they are *not* used in carrying on an insurance trade or business.

At the outset, we note that the conclusion of the district court is in accord with that of two other courts which have considered the problem. Western National Life Ins. Co. v. Commissioner, 50 T.C. No. 28 (1968); Franklin Life Ins. Co. v. United States 67–2 U.S.T.C. ¶ 9515 (S.D.Ill.1967), rev'd on other grounds, Franklin Life Ins. Co. v. United States, *supra.*

Aside from these decisions, it seems clear that agents' debit balances are assets of Jefferson and Pilot, and that § 805(b) (4) includes nonadmitted assets, which is how Jefferson and Pilot treat them. Except in the broadest sense, agents' debit balances are not accounts receivable used by an insurance company "in carrying on an insurance trade or business" and the legislative history of § 805(b) (4) would not support the broader meaning because, conceptually, the Phase I computation is not restricted to invested assets, but encompasses the total assets of a life insurance company and the portion thereof devoted to policy reserves.[26] If agents' debit balances are treated as personal property used by an insurance company in carrying on an insurance trade or business, the command of § 805(b) (4) that the term "assets" means all assets of the company, other than certain exceptions, would be rendered meaningless because the exceptions would be construed so broadly as to include literally all assets, so that nothing would be left.

26. H.Rep. No. 34, 86th Cong., 1st Sess., p. 12, fn. 1 (1959–2 Cum.Bull. 736, 744, fn. 1) :
"The company's earned rate actually is determined by dividing the company's 'investment yield' by its *total assets*." (emphasis supplied.)
And at p. 10 (H.Rep. No. 34) and p. 743 (1959–2 Cum.Bull.) :

"Making use of a company's actual earnings rate in arriving at the reserve deduction in effect allocates investment income between life insurance reserves and surplus, according to the *total amount* of each." (emphasis supplied.)

Regulation 1.805–5(a) (4) appears to take a reasonable position with regard to what assets constituting real and personal property are used by an insurance company in carrying on an insurance trade or business. The recent decision in United States v. Correll, 389 U.S. 299, 306–307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967), directs the course of our decision: .

"* * * we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 USC § 7805(a). In this area of limitless factual variations 'it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments.' Commissioner [of Internal Revenue] v. Stidger, 386 U.S. 287, 296, 87 S.Ct. 1065, 1071, 18 L.Ed.2d 53 [59]. The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner."

## IX

Taxpayer established a Branch Office Manager's Supplemental Retirement Plan in order to provide supplemental pension benefits to branch office managers. Taxpayer made contributions based upon the employee's salary and such contributions were not set apart or treated as separate funds but remained a part of the general corporate funds of taxpayer. If the employee reached the age of 65 while still in taxpayer's employ he was to receive an annuity. If the employee left taxpayer prior to age 65, died prior to age 65, becomes an agent or employee of another life insurance company at any time, including after retirement, or if taxpayer terminated his employment prior to that age, the employee had no right to any annuity nor to any part of taxpayer's contributions to the plan, irrespective of the number of years the employee belonged to the plan.

Taxpayer did not issue any actual annuity contracts to branch office managers upon their inclusion in the plan, although it did notify them of their rights under the plan and sent them annual reports of contributions made to the plan in their behalf. Taxpayer expressly reserved an "absolute and unconditional" right to terminate the employment of members of the plan, and also a right to modify or terminate the entire plan. Its right of modification or termination of the plan, however, did not permit it to affect the right of any employee to receive benefits accrued to his account under the plan prior to the effective date of such change or termination.

Because the category of employees included was not sufficiently broad (§ 401(a) (3) (A)), the plan did not meet the requirements of § 401, which provides that if a pension plan meets its requirements (1) income of the plan will be tax exempt and (2) the corporation may deduct its contributions within certain specified limitations.

The issue presented is whether taxpayer is entitled to treat a portion of the contributions made by it as "life insurance reserves," as defined under § 801(b) (1), so as to increase the policyholders' share exclusion under § 804 in the Phase I computation of the tax, as well as to increase the required interest exclusion and the deduction for increases in reserves under § 809 in the Phase II computation of the tax. The district court upheld the Commissioner's position that the amounts designated by taxpayer for funding the plan did not qualify as life insurance reserves under § 801(b) (1), and we affirm.

Section 805(c) (1) defines "adjusted life insurance reserves"—one of the components, the earnings on which form part of the policyholders' share exclusion —as "other than pension plan reserves." Section 805(d) (1) (C) provides a special benefit for life insurance companies in that it expressly provides that reserves

for pension plans *qualified under* § *401* may be included as pension plan reserves in computing reserves for purposes of the policyholders' share exclusion, so as to increase the measure of the exclusion. Taxpayer's *branch office manager plan* is not included in the benefit established by § 805(d) (1) (C) since it is not qualified under § 401. It is hardly likely that an intelligible legislative purpose would be served in providing that reserves for an insurance company's own pension plan *may be recognized in computing the* policyholders' share only if the plan qualifies under § 401, if the same reserves are to be recognizable in any event as life insurance reserves. This is apparent, even though, as taxpayer argues, the exclusion of "pension plan reserves" in § 805(c) (1) must be read as meaning "pension plan reserves" for a plan qualified under § 401 as § 805(d) (1) (C) later defines the term.

A more basic consideration leading to our affirmance of the district court is the retrievable nature of the alleged pension plan reserves. Taxpayer can invade or take back the amounts it has set aside in divers situations, viz., the resignation of a covered employee before age 65, the death of a covered employee before age 65, and the discharge of a covered employee. Only where rights accrued to his account under the plan prior to the effective date of modification or termination was taxpayer restricted in treatment of the funds set aside; even then, or after retirement, all benefits are forfeited if a branch office manager becomes an employee of any other life insurance company or sells life insurance for another company.

This restriction, however, is not sufficient to overcome the basic concept of the Act, that only amounts irrevocably put aside to meet certain future obligations to life insurance policyholders, and the earnings thereon necessary to augment the reserves for that purpose, should be rendered tax free. Unlike a true life insurance reserve, unilaterally, taxpayer may terminate the employee relationship and the purported benefit has no cash surrender value. Cf., Helvering v. Inter-Mountain Life Insurance Co., 294 U.S. 686, 55 S.Ct. 572, 79 L.Ed. 1227 (1935); New York Life Ins. Co. v. Bowers, 283 U.S. 242, 51 S.Ct. 399, 75 L.Ed. 1005 (1931); General Life Ins. Co. v. Commissioner, 137 F.2d 185, 189–190 (5 Cir. 1943); Massachusetts Mutual Life Ins. Co. v. United States, 56 F.2d 897, 74 Ct.Cl. 162 (1932). Even if the benefit vests, it is defeasible under certain circumstances. The fact that some pension plans permit the cancellation of benefits under certain circumstances is irrelevant, because taxpayer seeks to sustain its treatment of the amounts set aside, not on the theory that it has a pension plan approved under § 401, but on the theory that it has established reserves which are life insurance reserves.

The judgments of the district court are reversed in part and affirmed in part, as stated herein, and the cases are remanded for entry of judgments consistent herewith.

Affirmed in part; reversed in part; and remanded.